CITY OF WEST ALLIS, Kearney & Trecker Corporation and Giddings & Lewis, Inc., Plaintiffs-Respondents,†

v.

WISCONSIN ELECTRIC POWER COMPANY, Defendant-Third-Party Plaintiff-Appellant,††

v.

WISCONSIN GAS COMPANY, Third-Party Defendant.

Court of Appeals

*Nos. 99–2944, 00–1304. Oral argument April 3, 2001.—Decided September 5, 2001.*

2001 WI App 226

(Also reported in 635 N.W.2d 873.)

† Petition to review denied 1-29-02.
†† Petition for cross-review denied 1-29-02.

10

14

On behalf of the defendant-third-party plaintiff-appellant, the cause was submitted on the briefs of *Robert H. Friebert* of *Friebert, Finerty & St. John, S.C.*, of Milwaukee, and *Barbara Wrubel* and *R. Ryan Stoll* of *Skadden, Arps, Slate, Meagher & Flom* of Chicago, Illinois, with oral argument by *R. Ryan Stoll*.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *J. Ric Gass* and *Mark M. Leitner* of *Kravit, Gass, Hovel & Leitner, S.C.*, of Milwaukee, with oral argument by *J. Ric Gass*.

A nonparty amicus curiae brief was filed by *William R. Weissman* and *Steven J. Groseclose* of *Piper, Marbury, Rudnick & Wolfe, LLP,* of Washington, D.C., and *Kevin C. Potter* of *Brennan, Steil, Basting & MacDougall, S.C.,* of Madison, on behalf of Utility Solid Waste Activities Group, Edison Electric Institute, and American Gas Association.

A nonparty amicus curiae brief was filed by *Franklyn M. Gimbel* and *Kathryn A. Keppel* of *Gimbel, Reilly, Guerin & Brown,* of Milwaukee, on behalf of Metropolitan Milwaukee Association of Commerce.

Before Fine, Schudson and Curley, JJ.

¶ 1. CURLEY, J. Wisconsin Electric Power Company (WEPCO) appeals from a judgment entered following a jury verdict, that awarded: the City of West Allis (City) compensatory damages of $1,252,000; Giddings & Lewis (G&L) and its subsidiary, Kearney & Trecker Corporation (K&T) (collectively, G&L), compensatory damages of $3,216,000; and the City and G&L an undivided $100,000,000 in punitive damages. WEPCO also appeals the trial court's order imposing sanctions on the company for its failure to accurately advise the court of its possible insurance coverage for punitive damages, consisting of prohibiting WEPCO from pursuing insurance coverage for punitive damages and ordering a $104,468,000 default judgment as an alternative, if WEPCO prevailed on appeal.[1]

¶ 2. WEPCO argues that the trial court erred in: refusing to find that the economic loss doctrine barred G&L's claims; failing to submit its statute of limitations defense to the jury; submitting the punitive

---

[1] The two appeals were consolidated by an order dated June 20, 2000.

damages question to the jury; and accepting the verdict because it violates the requirement that five-sixths of the jurors agree. WEPCO also argues that the punitive damages verdict violates due process and that the real controversy with regard to punitive damages was not fully tried, warranting a new trial. Finally, WEPCO submits that the trial court's findings supporting the sanctions were clearly erroneous; that the trial court erred in its legal determinations; and that the sanctions imposed are unjust, punitive and violate due process.

¶ 3. We are satisfied that the trial court correctly determined that the statute of limitations defense should not be submitted to the jury and that the economic loss doctrine did not bar G&L's claims. However, we determine that the trial court erred in accepting the verdict as five-sixths of the jurors did not agree on the question setting the amount of punitive damages. We also conclude that the trial court erroneously exercised its discretion in imposing sanctions on WEPCO consisting of: (1) ordering WEPCO to stop pursuing insurance coverage for the punitive damages award; and (2) alternatively, if WEPCO should prevail on appeal, entering a default judgment against it commensurate with the compensatory and punitive damages jury awards. The trial court erroneously exercised its discretion because: the trial court's assumption that the jury was entitled to know about the existence of insurance covering punitive damages was erroneous and, as a result, WEPCO's mistake had no impact on the jury, making the sanctions unfair. Moreover, the trial court set the amount of the alternative default judgment based upon an invalid jury verdict concerning punitive damages. Finally, the trial court overstepped its authority when it ordered WEPCO to forego investigating whether it had insurance coverage for punitive

damages. Thus, we direct the trial court to withdraw the sanction order as to these issues and we remand for a new trial on the punitive damages question only. Because we have overturned these sanctions against WEPCO, we do not address the other issues raised by WEPCO.[2]

## I. BACKGROUND.

¶ 4. This suit followed the discovery of oxide box waste (OBW) on three properties, one of which was owned by the City, another by K&T, a subsidiary of G&L, and the third owned by WEPCO. OBW is a waste product of a process previously used to refine natural gas. Prior to the introduction of natural gas through pipelines in the 1940's, gas plants manufactured gas by baking coal at high temperatures. The gas produced through this process contained impurities that had to be removed. The primary process used for removing the impurities was filtering the gas through "oxide boxes" filled with wood chips and iron oxide. The used filtering material became OBW.

¶ 5. OBW has a distinctive prussian blue color as the result of a chemical reaction that takes place when the gas is filtered. When oxide boxes were still used, OBW was typically either disposed of in dumps or used as fill. Only two meaningful sources of OBW existed in southeastern Wisconsin during the time period relevant here. One was a Racine plant originally operated by Wisconsin Natural Gas Company, later acquired by WEPCO, and the other was a Milwaukee plant located in the Third Ward operated by Wisconsin Gas (WG).

[2] *Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (if decision on one point disposes of appeal, appellate court need not decide other issues raised).

Both plants ceased operations many years ago, the Racine plant closing in 1950, and the Third Ward plant closing in 1949.

¶ 6. The genesis of this suit was the discovery of OBW in 1990, when the City performed an environmental evaluation on its property located at 113th and Greenfield. The Department of Natural Resources (DNR) issued an order requiring the City to remediate its property. In 1992, the DNR inspected K&T's property, referred to as "Outlot A," and unearthed OBW, which was polluting nearby Underwood Creek. The DNR issued an order requiring K&T to remediate its property. The DNR also ordered WEPCO to remediate its adjoining property. All the properties were remediated, requiring the expenditure of significant amounts of money.

¶ 7. In 1996, the City and G&L, along with its subsidiary, K&T, sued WEPCO, claiming that WEPCO deposited the OBW on their properties, and sought money damages for the remediation of their two properties. G&L also sought additional sums for the diminution of value of its adjoining property, and the City sought to recoup lost property taxes. The City and G&L alleged that WEPCO deposited OBW on their land when it exercised its easements over their properties, and that WEPCO also placed significant quantities of OBW on G&L's adjoining land when WEPCO erected electrical towers on the property. WEPCO denied being the source of the OBW on either property, and argued that WG was responsible for it. To this end, WEPCO brought a third-party complaint against WG, claiming that WG was responsible for the placement of the OBW on the properties. Because of the passage of time, the plaintiffs' case claiming WEPCO was responsible for the OBW on the properties, and WEPCO's action claiming

WG was responsible, were largely circumstantial, relying on old records. Few eyewitnesses to the events were still living.

¶ 8. The jury, consisting of fourteen jurors, all of whom were allowed to deliberate and vote, began hearing the case on June 16, 1999. The jury returned its verdict on July 14, 1999. The issues at trial dealt primarily with the question of who placed the OBW on the two properties, when it was placed, what were the past and the then-current standards for OBW disposal, and how much danger did the OBW pose in the areas where it was found.

¶ 9. With respect to punitive damages, although the level of dangerousness of OBW was hotly disputed at trial, the City and G&L introduced evidence that OBW is acidic and contains cyanide. Experts at trial testified that OBW is particularly dangerous when immersed in water, as it can create hydrogen cyanide, a deadly gas. The City and G&L maintained that OBW on the properties posed a danger to people, other life forms and the water supply. Just prior to the plaintiffs resting, the trial court ruled that sufficient evidence had been admitted to permit the plaintiffs to seek punitive damages. Although the plaintiffs submitted proposed jury verdict forms containing two separate punitive damages questions, one for the City and the other for G&L, the trial court fashioned a verdict form which combined the amount to be awarded for punitive damages into one question.

¶ 10. Six days after the trial court determined that the question of punitive damages would be submitted to the jury and during WEPCO's case in chief, the plaintiffs subpoenaed the chairman of WEPCO. They informed WEPCO that they intended to ask the chairman questions related to the punitive damages issue. In

lieu of his live testimony, the parties entered into a stipulation that supplied the company's net income, its current net worth, the fact that the Public Service Commission would prohibit any compensatory damages to be paid by increasing existing rates, and stated that WEPCO had no insurance covering punitive damages. The jury awarded: G&L $1,216,000 for its remediation costs, and $2,000,000 for dimunition in value of an adjacent property; the City $1,252,000 for its remediation costs; and jointly awarded the plaintiffs an undivided $100,000,000 for punitive damages.

¶ 11. The jury exonerated WG and determined that WEPCO was solely responsible for the placement of OBW on the plaintiffs' properties. In answering the multiple jury questions, two jurors dissented to the question finding WEPCO responsible for the OBW on the City's land, and a different juror dissented to the amount of punitive damages to be awarded. WEPCO filed extensive motions after verdict which were denied by the trial court.

¶ 12. After the verdict, WEPCO hired a different law firm to investigate the possibility that punitive damages were covered by one of WEPCO's insurance policies. At the conclusion of a four-month review of 150 policies, the law firm determined that it was possible that several of the policies could cover punitive damages. WEPCO then submitted a letter to the court acknowledging that its earlier statement concerning the nonexistence of insurance coverage for punitive damages may have been mistaken. The plaintiffs brought a motion for sanctions and, after conducting an evidentiary hearing, the trial court granted the request for sanctions, ordering WEPCO to pay the costs and fees of the sanction action and desist from seeking punitive damages coverage from its insurers. The court

25

also ordered a default judgment in the identical amount of the compensatory and punitive damages, in the event WEPCO prevailed on appeal.

## II. ANALYSIS.

### A. *Statute of Limitations*

¶ 13. WEPCO first argues that the trial court erred in not submitting its statute of limitations defense to the jury. However, WEPCO failed to raise the issue at the instruction and verdict conference. *See* WIS. STAT. § 805.13(3). Under § 805.13(3), "[f]ailure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict." This court has held that a party's failure to request that a statute of limitations issue be submitted to the jury constitutes a waiver on that issue. *Burkart v. Time Ins. Co.*, 189 Wis. 2d 136, 149, 525 N.W.2d 342 (Ct. App. 1994). Therefore, because WEPCO did not object at the conference, it waived the statute of limitations issue and cannot raise it on appeal.

### B. *Economic Loss Doctrine*

¶ 14. Next, WEPCO argues that the economic loss doctrine bars G&L's claims and renders the punitive damages verdict defective. The application of the economic loss doctrine is a matter of law, which this court reviews *de novo. State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225 Wis. 2d 305, 314, 592 N.W.2d 201 (1999). We disagree with WEPCO and hold that G&L's claims are not barred by the economic loss doctrine.

¶ 15. The supreme court defines the economic loss doctrine as a "judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400, 573 N.W.2d 842 (1998). Generally, an economic loss is the " 'diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' " *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 925–26, 471 N.W.2d 179 (1991) (citation omitted).

¶ 16. The economic loss doctrine exists to protect the expectations of parties to commercial transactions and allows such parties the freedom to allocate any incidental risks. Wisconsin law requires transacting parties to pursue *only* their contractual remedies when asserting an economic loss claim, thus preserving the distinction between contract and tort law. *Daanen & Janssen, Inc.*, 216 Wis. 2d at 403.

¶ 17. In the instant case, K&T purchased Outlot A in 1953. WEPCO maintained easements over this property since the 1920's. In 1958, WEPCO's pre-existing easement was changed, authorizing it to construct, maintain, operate, and replace electrical towers, and also providing WEPCO access to a driveway. G&L subsequently purchased K&T and was held responsible for remediation of the site by the DNR. There simply was no agreement between WEPCO and either K&T or G&L involving the deposit of OBW on the property.

¶ 18. WEPCO and G&L were not parties to any commercial transactions involving the purchase or de-

27

posit of OBW. The only commercial transaction between WEPCO and either K&T or G&L involved negotiation of the. easement, of which no evidence exists that WEPCO negotiated that it would be allowed to dump OBW on the land.

¶ 19. WEPCO relies heavily on *Mose v. Tedco Equities–Potter Road Ltd. P'ship*, 228 Wis. 2d 848, 598 N.W.2d 594 (Ct. App. 1999), for the proposition that the economic loss doctrine bars G&L's tort claims. However, *Mose* is distinguishable from the present case. Mose had purchased property from Tedco in 1989 with full knowledge that the property had been contaminated with hazardous wastes by a former owner, Empire, and negotiated a lower sale price because of the contamination. *Id.* at 852. Later, Mose sued Empire for the remediation costs alleging five tort claims, including strict liability, waste and negligence. *Id.* We upheld the trial court's dismissal of all five claims based on the economic loss doctrine because: "Mose purchased the property knowing that it was contaminated. He took the risk. He negotiated a compromised purchase price as a result [and] cannot now expect to circumvent the contract to sue the original owner/occupier for a tort recovery for his economic losses." *Id.* at 857.

■■

¶ 20. Unlike Empire, WEPCO never owned the contaminated land in question. WEPCO only purchased an easement, which led to contamination not only on the easement, but also on the adjacent land now owned by G&L. Furthermore, WEPCO's dumping of OBW was not negotiated between either K&T or G&L and WEPCO as part of any contract involving the land in question, including the easements. Unlike *Mose*, neither G&L nor K&T knew that the land was going to be contaminated and neither party negotiated a compro-

mised purchase price as a result. Thus, we find that the economic loss doctrine neither bars G&L's claims nor precludes G&L from collecting punitive damages.

## C. *Punitive Damages.*

¶ 21. With respect to the punitive damages issue, WEPCO contends that: (1) the trial court erred in submitting the punitive damages question for the jury's consideration; (2) the jury's verdict violates the requirement that five-sixths of the jurors agree; (3) WEPCO did not waive its objection to the verdict by not raising the five-sixths verdict defect until its motions after verdict; (4) the punitive damages verdict violates due process; and (5) the real controversy concerning punitive damages was not fully tried, warranting a new trial. We conclude that the trial court properly submitted the punitive damages verdict question to the jury. However, we determine that because of the manner in which the jury answered the questions on the verdict, the answer to the punitive damages question violated the requirement that five-sixths of the jurors agree. Further, we conclude that WEPCO did not waive its right to raise a five-sixths verdict agreement objection by raising the issue for the first time in its motions after verdict. Consequently, we reverse the judgment as it pertains to punitive damages, and we remand for a new trial on this sole issue.

1. Punitive damages were properly submitted to the jury.

¶ 22. Pursuant to Wis. Stat. § 895.85, "the plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously to-

ward the plaintiff or in an intentional disregard of the rights of the plaintiff."[3] "Before the question of punitive damages can be submitted to a jury, the circuit court must determine, as a matter of law, that evidence was presented at trial that would support an award of punitive damages." *Sharp v. Case Corp.*, 227 Wis. 2d 1, 20–21, 595 N.W.2d 380 (1999). The evidence necessary to allow the punitive damages question to be decided by the jury must warrant a conclusion that to a reasonable certainty the conduct was "outrageous." *Id.* at 21. The evidence must also be "clear and convincing." *Hennig v. Ahearn*, 230 Wis. 2d 149, 182–83, 601 N.W.2d 14 (Ct. App. 1999).

■

¶ 23. The issue here is whether sufficient evidence permitted the trial court to rule that the record supported the plaintiffs' contention that WEPCO acted outrageously by intentionally disregarding their rights. We review the trial court's decision *de novo. Id.* at 183.

¶ 24. In determining that the punitive damages question should be submitted to the jury, the trial court noted that evidence in the record supported its conclusion that clear and convincing evidence existed to permit a finding that WEPCO acted outrageously when it intentionally disregarded the plaintiffs' rights by discharging OBW on their property. The trial court determined that strong circumstantial evidence established that WEPCO deposited the OBW on the City's and G&L's lands, that WEPCO's actions were intentional, and that they constituted outrageous conduct in

---

[3] All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

disregard of the plaintiff's property rights. Our independent review of the evidence confirms the trial court's decision.

¶ 25. The City and G&L submit that punitive damages were properly submitted to the jury because WEPCO intentionally disregarded their property rights. According to WIS JI—CIVIL 1707.1, "[a] person acts in an intentional disregard of the rights of the plaintiff if the person acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are practically certain to result in the plaintiff's rights being disregarded." Upon review, we also conclude that the City and G&L presented a strong circumstantial case that WEPCO was responsible for the OBW buried on the properties. Here, it was undisputed that whoever placed the OBW on the lands did so intentionally. No testimony was presented that WEPCO had permission to dump any waste on the two properties. Indeed, WEPCO's position at trial was that Wisconsin Gas was the guilty party. Further, the City and G&L proved that over 26,000 tons of OBW were deposited on their lands, an amount that could only have been placed by repeated dumpings. The City and G&L also presented expert testimony that the other alternatives existed for disposing of the OBW, but that those alternatives were more expensive.

¶ 26. With regard to the damage done by the OBW on the properties, the plaintiffs submitted evidence that OBW was a hazard, inasmuch as it is corrosive and dangerous, particularly in wet areas. Illustrative of the significant damage the OBW did to the land, one expert, in discussing the environmental harm done by the toxic waste, claimed that it registered "a 9.5 on a 10 point scale.". Witnesses explained that because the owners

31

were unaware of any OBW on the properties, much less the huge amounts of OBW dumped on these properties, the OBW posed a far more serious danger to people and to other life forms than it posed on other OBW sites. We further note that the case law reveals a strong public policy favoring the protection of property rights, *see Weber v. Sunset Ridge, Inc.*, 269 Wis. 120, 126, 68 N.W.2d 706 (1955); *People's Land & Mfg. Co. v. Beyer*, 161 Wis. 349, 352, 154 N.W. 382 (1915), and here, the record supports a finding that WEPCO's repeated actions were deceitful, flagrant and totally contrary to the rights of the property owners. In sum, there was ample evidence in the record, if believed, that WEPCO's conduct was outrageous and that WEPCO intentionally disregarded the City's and G&L's rights. This evidence permitted the trial court to submit a punitive damages question to the jury.

> 2. An objection to a five-sixths rule violation was properly raised in motions after verdict and the rule was violated because of the jurors' answers to the punitive damages question.

¶ 27. The trial court ruled there was no five-sixths defect in the verdict and found that even if there was one, it was waived because WEPCO failed to raise the issue until motions after verdict. WEPCO contends that the trial court erred in holding that it waived its rights to claim the jury's verdict violated the five-sixths rule because it raised no objection until it filed its motions after verdict. WEPCO also argues that the trial court's determination that the five-sixths rule was not violated is wrong. We agree with both of WEPCO's contentions.

¶ 28. The Wisconsin Constitution, as well as WIS. STAT. § 805.09(2), require that five-sixths of the jury agree on all questions necessary to support a judgment. Article I, § 5 reads:

> The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law. Provided, however, that the legislature may, from time to time, by statute provide that a valid verdict, in civil cases, may be based on the votes of a specified number of the jury, not less than five-sixths thereof.

Section 805.09(2) provides: "A verdict agreed to by five-sixths of the jurors shall be the verdict of the jury. If more than one question must be answered to arrive at a verdict on the same claim, the *same* five-sixths of the jurors must agree on all the questions" (emphasis added).

¶ 29. As noted, the verdict returned by the jury contained several questions to which some jurors dissented. Since the parties stipulated that all fourteen jurors selected could deliberate and cast a vote, twelve jurors were required to agree in order to meet the five-sixths rule.[4]

¶ 30. The trial court initially acknowledged that three different jurors dissented: "At issue are the fact that A and B dissented to Question Number 1 and C dissented to Question Number 21." However, the trial court, ruled that WEPCO waived the five-sixths rule

---

[4] Mathematically, five-sixths of a fourteen-person jury would require 11.666 jurors to agree.

33

issue by not objecting earlier and, in any event, the trial court remarked that there was no fatal five-sixths defect.

> Either the defendant consciously decided not to object to save an objection for post-verdict motions, or the defendant agreed with the Court that the verdict was not defective. In either event, the objection is now to no avail. Failure to object at the proper time constitutes waiver.

> But more significantly, I think it's the latter option because there is no fatal defect. Despite the defendant's argument to the contrary, the dissent of Juror C to Question 21 does not mean that juror did not agree that punitive damages should be awarded. Indeed, given the wording of that question and the wording of Questions 19 and 20, 19 and 20 asked whether the actions of the defendant WEPCO was [sic] an intentional disregard of the rights of the City of West Allis and the owners of the property at 113th and Greenfield, and Number 20, the rights of Giddings & Lewis as the owners of the property now called Outlot A. Given the wording of those questions, what we do know is the juror found that the defendant did act in an intentional disregard of the plaintiffs' rights. There were no dissents to either of those questions.

¶ 31. We first address whether WEPCO waived its objection. Whether the failure to object at the time the jury returns its verdict results in a waiver of the objection is a legal question, *see Wirth v. Ehly*, 93 Wis. 2d 433, 444, 287 N.W.2d 140 (1980) (holding that waiver is a question of law), which this court decides *de novo, First Nat'l Leasing Corp. v. Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977). Our review of the case law satisfies us that the trial court was mistaken in ruling

34

that WEPCO waived its objection to the five-sixths rule because it failed to raise the issue until post-verdict motions.

¶ 32. *Seif v. Turowski*, 49 Wis. 2d 15, 181 N.W.2d 388 (1970), supports our view. In *Seif*, the supreme court opined:

> Although plaintiffs-appellants could have requested the court to send the jury back to resolve the inconsistency, failure to do so does not necessarily result in a waiver [because where] the resolution of the inconsistency requires an extensive review of the evidence, the matter may well be considered more judiciously in motions after verdict.

*Id.* at 21. Admittedly, after *Seif* was decided, some confusion arose in the case law over whether a party's failure to object at the time of the jury return constituted a waiver; however, the *Seif* holding was reaffirmed in *Westfall v. Kottke*, 110 Wis. 2d 86, 328 N.W.2d 481 (1983). In discussing the confusion that arose over the issue, the supreme court explained:

> A careful examination of *Seif* and other cases which have lent themselves to such interpretation reveals, however, that this court was expressing its position in respect to waiver of an objection to an inconsistent verdict, and its conclusion that failure of counsel to assert the inconsistency at the return of the verdict did not waive the right to object to the verdict on post-trial motions. We do not retreat from our position in respect to nonwaiver by the objecting party, but we do hold that, when that objection is made only in post-trial motions, an inconsistent verdict will result in a new trial and the verdict at that juncture cannot be saved.

*Id.* at 96.

¶ 33. The City and G&L counter that the cases cited by WEPCO in support of its position dealt with inconsistent verdicts. The City and G&L claim that here the objection raised by WEPCO in its motion after verdict was premised on a five-sixths rule violation. They posit that the only published Wisconsin case addressing a failure to raise a five-sixths rule violation at the time the verdict was returned is *State v. Aimee M.*, 194 Wis. 2d 282, 533 N.W.2d 812 (1995). In *Aimee M.*, the supreme court observed that counsel's failure to object constituted waiver, but the court nevertheless elected to address the question in the interest of justice. Thus, the City and G&L submit that the trial court correctly ruled that WEPCO waived its right to object. We disagree.

██

¶ 34. *Seif* and *Westfall* permit a party to raise an objection to the verdict for the first time in the motions after verdict. *Aimee M.* discusses a separate issue; that is, whether the five-sixths rule violation was the result of the wording of the verdict form. Explaining the problem, in *Aimee M.*, the supreme court remarked:

> [The] [p]etitioner objects, as she did on her motion for postjudgment relief, to the form of the verdict on the grounds that: (1) using a single-question verdict form when two or more independent grounds for jurisdiction have been alleged does not require, as it must, that the jury to determine [sic] which factual allegations were proven and, therefore, the verdict did not ensure that a numerically sufficient five-sixths was reached on each jurisdictional ground challenged; and (2) the determination of whether or not a child is in need of protection or services is not an ultimate question of fact for the jury but, rather, a conclusion of law for the court.

*Aimee M.*, 194 Wis. 2d at 290–91. Unlike the problem found in *Aimee M.*, WEPCO objected not to the *wording* of the verdict, but to the *result* of the verdict after the various dissents were considered. The five-sixths rule violation was not a result of the wording of the verdict questions themselves. Had the questions been answered differently by the jury, no violation would have occurred. Consequently, the facts here fall squarely within the *Seif* and *Westfall* rule, not the holding in *Aimee M.* As a result, we determine that WEPCO did not waive its right to raise an objection based upon a five-sixths rule violation when it first raised the issue in its motions after verdict.

¶ 35. Inasmuch as we are satisfied that WEPCO preserved its right to object to the effect of the verdict, we next examine whether the five-sixths rule was violated.

¶ 36. "To have a valid verdict the *same* [five-sixths of the] jurors must concur in the answers to all questions which are necessary to support a judgment; otherwise the verdict is defective." *McCauley v. International Trading Co.*, 268 Wis. 62, 70, 66 N.W.2d 633 (1954) (emphasis added). The same five-sixths of the jury must have unanimity on the answers that establish both liability *and* the measure of damages. *See Giese v. Montgomery Ward, Inc.*, 111 Wis. 2d 392, 402, 331 N.W.2d 585 (1983). After reviewing the verdict, we are satisfied that the five-sixths rule was violated.

¶ 37. The City and G&L submit that because no jurors dissented from the questions inquiring whether WEPCO intentionally disregarded the rights of the City and G&L, clearly all fourteen jurors agreed that punitive damages were appropriate and only the amount was disputed. They, like the trial court, believe that

since only one juror dissented to the punitive damages amount, there is no five-sixths defect. Alternatively, they submit that if there is a five-sixths problem, a new trial should address only the punitive damages question. As noted, we conclude there was a five-sixths violation. We agree, however, that the violation renders only the punitive damages question defective, and we remand for a trial on that sole issue.

¶ 38. The flaw, caused by the jury's answers, leading to the five-sixths violation, lies with the following:

**QUESTION NO. 1:**

Did WEPCO place manufactured gas plant waste, also known as prussian blue or oxide box waste, on the property of the City of West Allis at 113th and Greenfield Avenue? . . .

**QUESTION NO. 2:**

Did WEPCO place manufactured gas plant waste, also known as prussian blue or oxide box waste, on the property now called Outlot A? . . .

### CITY OF WEST ALLIS QUESTIONS

Answer Questions 5–10 only if you have answered Question 1 yes. That is, if your answer to Question 1 is yes, then answer these questions.

**QUESTION NO. 5:**

Did WEPCO commit waste by placing manufactured gas plant waste, also known as prussian blue or oxide box waste, on the property owned by the City of West Allis? . . .

### GIDDINGS & LEWIS QUESTIONS

Answer Questions 12–17 only if you have answered Question 2 yes. That is, if your answer to Question 2 is yes, then answer these questions.

**QUESTION NO. 12:**

Did WEPCO commit waste by placing manufactured gas plant waste, also known as prussian blue or oxide box waste, on the property now called Outlot A? . . .

### PUNITIVE DAMAGES QUESTIONS

**QUESTION NO. 19:**

If you answered yes to one or more of Questions 5, 7, 8, 9 or 10, then answer this question:

Were the actions of defendant WEPCO in an intentional disregard of the rights of City of West Allis as the owner of the property at 113th and Greenfield? . . .

**QUESTION NO. 20:**

If you answered yes to one or more of Questions 12, 14, 15, 16 or 17, then answer this question:

Were the actions of defendant WEPCO in an intentional disregard of the rights of Giddings & Lewis as the owner of the property now called Outlot A? . . .

If you answered yes to **either** Question 19 or 20, proceed to Question 21. If you answered no to **both** Questions 19 and 20, proceed to Question 22.

**QUESTION NO. 21:**

What sum of money do you award as punitive damages against the defendant WEPCO?

¶ 39. Here, the flaw was created by the manner in which the jurors answered the questions after the trial court combined the two punitive damages questions into one. There were dissents by three separate jurors. The first juror, Juror A, dissented from Question 1 and

39

Question 2. Therefore, that juror determined that WEPCO had not disposed of any waste on either property and, accordingly, this juror answered none of the questions regarding punitive damages. The second juror, Juror B, dissented from Question 1 but not from Question 2. Thus, this juror determined that WEPCO did not place OBW on the City's property and, therefore, was not liable to the City for punitive damages. However, as noted, this juror was allowed to answer Question 21 awarding punitive damages to G&L and the City because the juror had answered "yes" to Question 2 and Question 20. Finally, the third juror, Juror C, dissented from Question 21, even though that juror had assigned liability to WEPCO by answering "yes" to Question 1 and Question 2.

¶ 40. Therefore, while twelve jurors actually answered Question 21 awarding punitive damages, they were not the same twelve jurors who found WEPCO responsible for placing the OBW on the City's land. Because the same five-sixths of the jurors did not concur in all of the answers to all the questions necessary to support the judgment, a five-sixths violation occurred and the verdict was defective. *See McCauley* 268 Wis. at 70.

¶ 41. Had the trial court not *sua sponte* combined the separate punitive damages questions into one, there may well have been a valid punitive damages verdict as to G&L. However, the punitive damages cannot stand as to either party because the same five-sixths did not concur as to both liability and damages for each party, and, therefore, there is no way of knowing what part of the $100,000,000 was earmarked for G&L. Ironically, the trial court noted one of the problems, but reached a different conclusion regarding it. The trial court, in

addressing the fact that Question 21 asked how much money should be awarded to the parties for punitive damages, stated "we can only speculate whether Juror C contended a greater or lesser amount was appropriate; thus, there was no dissent as to whether punitive damages should be awarded." However, it is exactly because Juror C failed to support the punitive damages award that the five-sixths violation occurred. We cannot now speculate whether the juror wanted to award more, less, or no punitive damages, but it is clear that the juror failed to support the entire verdict. Accordingly, the same five-sixths of the jurors did not support the judgment and a violation occurred.

¶ 42. Having determined that a five-sixths violation occurred, we next determine whether the entire matter must be retried. WEPCO urges us to remand for a new trial on all issues. We agree with the City's and G&L's contention that any five-sixths verdict violation that occurred here requires a remand for a new trial only on the punitive damages question. In reaching this conclusion, we have reviewed the case law regarding punitive damages. There is precedent for a jury deciding only the punitive damages issue. *See Badger Bearing, Inc. v. Drives & Bearing, Inc.*, 111 Wis. 2d 659, 662, 331 N.W.2d 847 (Ct. App. 1983). Further, we note that inasmuch as the purpose of punitive damages is "to punish and to deter," *Tucker v. Marcus*, 142 Wis. 2d 425, 437, 418 N.W.2d 818 (1988), once a jury has determined that compensatory damages are appropriate, the jury then considers various factors in deciding whether to award punitive damages. These factors include: "the grievousness of defendant's acts; the degree of malicious intention; the potential damage which might have been done by such acts as well as the actual damage;

and the defendant's ability to pay." *Id.* at 446 (citation omitted). Here, the first jury awarded compensatory damages. Another jury can evaluate the evidence, review the factors and determine whether punitive damages are appropriate and, if so, how much should be awarded to each party. Thus, while we conclude a five-sixths rule violation occurred requiring a new trial, we also determine that the new trial should be held to decide punitive damages only.

D. *Sanctions*

■■■■■

¶ 43. The imposition of sanctions is reviewed for an erroneous exercise of discretion. *Chevron Chem. Co. v. Deloitte & Touche*, 176 Wis. 2d 935, 946, 501 N.W.2d 15 (1993). "A discretionary decision will be sustained if the circuit court has examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Johnson v. Allis Chalmers Corp.*, 162 Wis. 2d 261, 273, 470 N.W.2d 859 (1991). We will affirm the trial court's exercise of discretion unless it fails to properly apply the law or makes an unreasonable determination under the existing facts and circumstances. *Sullivan v. American Cas. Co.*, 169 Wis. 2d 637, 644, 486 N.W.2d 549 (Ct. App. 1992).

¶ 44. As noted, the trial court sanctioned WEPCO for its submission of an inaccurate stipulation in July 1999 stating it had no punitive damages coverage. The trial court found that WEPCO employees deliberately misled the court regarding their knowledge of punitive damages insurance. Further, the trial court believed that WEPCO should have corrected its mistake regarding punitive damages insurance long before November 1999, when it sent a letter to the court advising that its

earlier conclusion that punitive damages coverage did not exist was, possibly, mistaken. The trial court assumed punitive damages insurance information was admissible, and thus concluded that the misrepresentation was done "to gain a direct financial advantage." It also surmised that the misrepresentation was egregious and prejudicial because the plaintiffs were "denied a fair trial." Further, with reference to WEPCO's belated corrective action, the trial court claimed that its "failure to disclose the truth during motions after verdict to take further advantage of the system is equally egregious." As a result, the trial court ordered WEPCO to pay all costs and attorneys' fees of the sanction proceedings, amounting to approximately $250,000; to cease its pursuit of insurance coverage for punitive damages; and, alternatively, the trial court entered a default judgment against WEPCO in the amount of the jury verdict of approximately $104,500,000, should WEPCO prevail on appeal.[5]

¶ 45. WEPCO submits that the trial court "abuse[d] its sanctioning powers" and that the trial court's order "imposed punitive sanctions of [a] shocking scope." In furtherance of its position, WEPCO asserts that the trial court erred in making its factual findings; that it misapplied the law; and that the sanctions violate due process. We are satisfied that the trial court erroneously exercised its discretion. In reaching our conclusion, we assume, without deciding, that the trial court's factual findings can withstand the clearly erroneous test. Nevertheless, taking the facts as found by the trial court, we determine that the sanctions must be reversed because: (1) the trial court's assumption that the existence of insurance covering a

---

[5] WEPCO does not challenge the costs and fees on appeal.

punitive damage award was admissible finds no support in Wisconsin's case law; (2) the trial court's subsequent legal conclusions, that WEPCO's actions resulted in financial gain to WEPCO and were prejudicial because the actions denied the plaintiffs a fair trial, is also incorrect, rendering the imposed sanctions unfair and unreasonable; (3) the default judgment was grounded on the jury verdict of $104,500,000, $100,000,000 of which is no longer valid because, we have concluded, it violated the five-sixths juror agreement rule; and (4) finally, the trial court overstepped its authority in prohibiting WEPCO from submitting its punitive damages claims to its insurance carriers.

¶ 46. We decline to address WEPCO's constitutional challenges. When a case may be resolved on non-constitutional grounds, we need not reach constitutional questions. *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 612, 407 N.W.2d 873 (1987).

 1. Insurance coverage for punitive damages is not admissible.

¶ 47. Initially, WEPCO's counsel erroneously argued to the trial court that insurance for punitive damages was against public policy in Wisconsin. The trial court correctly ruled to the contrary. *See Brown v. Maxey*, 124 Wis. 2d 426, 444–48, 369 N.W.2d 677 (1985). However, the trial court, in expressing its ire at WEPCO's oversight, went on to assert that the "relevance and admissibility" of punitive damage insurance was "obvious." We disagree with the trial court's assumption that insurance coverage for punitive damages is admissible as no Wisconsin case so states, and our research leads us to the contrary result.

¶ 48. WISCONSIN STAT. § 904.11 prohibits the introduction of evidence of insurance or the lack of insurance. It directs:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This section does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

Thus, ordinarily the existence of liability insurance cannot be used to show negligence or fault. *See* McCOR-MICK ON EVIDENCE, § 202 at 711–12 (5th ed. 1999). The historical justification for the rule is the minimal probative value of this evidence compared with the potential impact on jury verdicts. *Id.* Clearly, the legislature's concern in preventing a jury from knowing of any liability insurance is that the jury may be swayed by the existence of insurance, sensing a greater ability to pay, when considering damage questions. Conversely, where the defendant is uninsured or has minimal coverage, the jury may be swayed to reduce damages. *Id.* Therefore, the existence of insurance is immaterial when fairly assessing money damages because it diverts the jury's attention from the actual harm suffered to what the defendant will be able to pay. We believe the rationale for this rule applies as well to punitive damages questions.

¶ 49. The concern that the jury will be improperly influenced by the existence of insurance is greater for punitive damages than it is for compensatory damages. The natural tendency will be for a jury to use the

punitive damages insurance coverage amount as a floor when setting punitive damages, rather than evaluating relevant evidence in deciding on a sum. Further, punitive damages fall within the ambit of Wis. Stat. § 904.11. The statute states that evidence of insurance is inadmissible when evaluating whether a "person acted . . . otherwise wrongfully." Punitive damages are awarded to punish or deter wrongdoing. *Brown*, 124 Wis. 2d at 439–40. Therefore, in order to obtain punitive damages, one must allege that a person "acted . . . wrongfully." Although we note that when assessing punitive damages a jury is permitted to know evidence of the wrongdoer's wealth, *see* Wis JI—Civil 1707.1, insurance coverage is not evidence of wealth. *See Baker v. Armstrong*, 744 P.2d 170, 173 (N.M. 1987) ("punitive damages liability coverage is not an asset which can be used to measure true punishment and . . . therefore, it should not be considered by the jury in assessing a defendant's financial standing.") While no case addresses this issue in Wisconsin, the exclusion of evidence of punitive damages insurance is the rule. *Id.*; *see also Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 40–41 (Tex. 1998).

2. The conduct complained of did not merit the sanctions imposed.

¶ 50. Our determination that punitive damages insurance coverage is inadmissible dovetails into our next reason why the trial court's sanctions order merits rejection. Because the trial court's legal conclusion was wrong with respect to the admissibility of punitive damages insurance, the trial court's evaluation of the impact of WEPCO's action was equally wrong and created a sanction disproportionate to the actual harm done.

¶ 51. The trial court " 'necessarily abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law.' " *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). A trial court also erroneously exercises its discretion when it renders a sanction that is not "just" – namely a sanction that is not "tailor[ed] . . . to the severity of the party's misconduct." *Johnson*, 162 Wis. 2d at 286.

¶ 52. *Chevron* is instructive. There, the supreme court upheld the trial court's sanction of overturning the jury verdict in favor of one of the parties because of the continual misconduct by a lawyer for the prevailing party. *Chevron*, 176 Wis. 2d at 945. The trial court felt that the misconduct actually influenced the jury to return an incorrect verdict. Thus, *Chevron* holds that a sanction will be upheld only if it is reasonably related to the conduct complained of. *See id.* at 947.

¶ 53. Here, we have determined that no evidence of WEPCO's punitive damages insurance coverage would have gone to the jury and, indeed, as we have explained, that evidence is not admissible. Therefore, the City and G&L were not prejudiced by any lack of candor or investigation done by WEPCO in entering into a stipulation that no punitive damages coverage was available. Contrary to the trial court's conclusion, the City and G&L were not denied a "fair trial," nor did WEPCO's misrepresentation result in any "financial advantage" to it. This is so because the jury would never have learned of the punitive damages coverage. A failure to tailor sanctions to the severity of the party's misconduct constitutes an erroneous exercise of discre-

tion. *See Johnson*, 162 Wis. 2d at 273. Here, we are satisfied that the severe sanctions entered by the court for WEPCO's misrepresentation, when no serious harm was done to the opposing party, were unreasonable.

¶ 54. Indeed, the trial court conceded its sanction was harsh, but observed that, given the impact of the misrepresentation, it had to "send a message." Since the actual impact of WEPCO's allegedly improper conduct did not lead to the consequences contemplated by the trial court, we find the extremely harsh sanctions to be an erroneous exercise of discretion, as the sanctions bore no rational relationship to the offensive conduct.

¶ 55. Moreover, the trial court's assumption that WEPCO failed to investigate its insurance coverage is erroneous. This was not a case, for example, where a homeowner had only one or two policies to examine. Here, WEPCO was investigating over 150 commercial insurance policies of significant complexity and length.

3. <u>The trial court's default judgment sanction is based upon the jury's verdict, a substantial part of which has been reversed.</u>

¶ 56. In the trial court's findings setting forth its sanctions order, the trial court ordered a default judgment "in the amount of the jury verdict." Inasmuch as this court has determined that the award of punitive damages was improper due to the failure of five-sixths of the jury to agree, it is axiomatic that basing a sanction on a faulty verdict is an erroneous exercise of discretion and cannot be sustained.

### 4. The trial court's sanction of requiring WEPCO to forego any insurance coverage is improper.

¶ 57. Finally, we address the question of whether the trial court had the authority to require WEPCO to cease all efforts to claim punitive damages coverage from its insurers. At oral argument, WEPCO urged us to find that the trial court erroneously exercised its discretion with regard to this unusual sanction. The City and G&L declined to support the trial court's action. We are satisfied that the trial court lacked authority to order WEPCO to forego its insurance rights. First, the trial court cited WIS. STAT. §§ 804.12[6]

---

[6] WISCONSIN STAT. § 804.12 provides:

(1) MOTION FOR ORDER COMPELLING DISCOVERY. A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery as follows:

(a) Motion. If a deponent fails to answer a question propounded or submitted under s. 804.05 or 804.06, or a corporation or other entity fails to make a designation under s. 804.05(2)(e) or 804.06(1), or a party fails to answer an interrogatory submitted under s. 804.08, or if a party, in response to a request for inspection submitted under s. 804.09, fails to respond that inspection will be permitted as requested or fails to permit inspection as requested, the discovering party may move for an order compelling an answer, or a designation, or an order compelling inspection in accordance with the request. When taking a deposition on oral examination, the proponent of the question may complete or adjourn the examination before he or she applies for an order. If the court denies the motion in whole or in part, it may make such protective order as it would have been empowered to make on a motion made pursuant to s. 804.01(3).

(b) Evasive or incomplete answer. For purposes of this subsection an evasive or incomplete answer is to be treated as a failure to answer.

and 805.03[7] as authority for sanctioning WEPCO. Both statutes limit the court's authority to actions pending before it. WEPCO has not requested that the trial court construe its rights under any policies to punitive damages. Nor has any insurer intervened seeking a declaration of its rights concerning the policy language. Thus, no action regarding WEPCO's entitlement to punitive damages is before the court. Therefore, the

(c) Award of expenses of motion. 1. If the motion is granted, the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

2. If the motion is denied, the court shall, after opportunity for hearing, require the moving party or the attorney advising the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

3. If the motion is granted in part and denied in part, the court may apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner.

[7] WISCONSIN STAT. § 805.03 provides:

For failure of any claimant to prosecute or for failure of any party to comply with the statutes governing procedure in civil actions or to obey any order of court, the court in which the action is pending may make such orders in regard to the failure as are just, including but not limited to orders authorized under s. 804.12(2)(a). Any dismissal under this section operates as an adjudication on the merits unless the court in its order for dismissal otherwise specifies for good cause shown recited in the order. A dismissal on the merits may be set aside by the court on the grounds specified in and in accordance with s. 806.07. A dismissal not on the merits may be set aside by the court for good cause shown and within a reasonable time.

trial court exceeded its authority by ordering WEPCO to forego any potential coverage for punitive damages. In an analogous situation, in *Paytes v. Kost*, 167 Wis. 2d 387, 482 N.W.2d 130 (Ct. App. 1992), where a discovery sanction was imposed in the first of two actions concerning the same parties, this court found that the statute authorizing discovery sanctions "limits the sanctions to the case at hand." *Id.* at 397. Here, too, the trial court's authority to impose sanctions is limited to the action before it. Thus, we conclude the trial court lacked the authority to determine the rights of WEPCO with its insurance companies and, by exercising its authority over actions not before it, the court erroneously exercised its discretion.

¶ 58. Accordingly, this matter is affirmed in part, reversed in part and remanded. The trial court is directed to withdraw its sanctions order and conduct a new trial on the punitive damages issue only.

*By the Court.*—Judgment affirmed in part and reversed in part; order affirmed in part and reversed in part; and cause remanded with directions.

¶ 59. SCHUDSON, J. (*concurring/dissenting*). I join the majority in concluding that the trial court correctly determined that the statute of limitations defense should not be submitted to the jury, that the economic loss doctrine did not bar G&L's claims, and that the evidence supported submission of the punitive damages issue to the jury. *If* a new trial is required, I also agree that only the punitive damages issue needs to be retried. But I disagree with the majority's view that a new trial is needed.

## I. Verdict / Waiver

¶ 60. As the majority notes, "Although the plaintiffs submitted proposed jury verdict forms containing

two separate punitive damages questions, one for the City and the other for G&L, the trial court fashioned a verdict form which combined the amount to be awarded for punitive damages into one question." Majority at ¶ 9. *WEPCO did not object.* Indeed, counsel for WEPCO, arguing post-verdict motions, reiterated: "It's not a problem with the verdict form. We're not arguing there is something wrong with the verdict form."

¶ 61. Thus, in this case, we consider an extraordinary situation: (1) *The plaintiffs* requested verdict forms that would have required separate punitive damages verdicts. (2) *The plaintiffs' request was denied.* (3) *WEPCO did not object to the trial court's verdict form, which merged what otherwise would have been the two separate punitive damages verdicts requested by the plaintiffs.* (4) Upon return of the verdicts, *WEPCO still did not object* to the form of the punitive damages verdict. (5) In post-verdict motions, *WEPCO still did not object* to the form of the punitive damages verdict. Instead, in post-verdict motions, WEPCO maintained, for the first time, that the jury's *verdict,* not the *verdict form,* required a new trial. But, of course, the verdict and the verdict form were inextricably connected. Simply stated, the jury could not have returned the punitive damages verdict *WEPCO* belatedly challenged had the trial court segmented the punitive damages verdicts as the *plaintiffs* originally requested.

¶ 62. Nevertheless, according to the majority, *WEPCO,* despite having agreed to the merged punitive damages verdict form, and despite never objecting to that form when the verdict was returned and the jury could have been re-instructed and ordered to deliberate further, now gains a new trial where, presumably, the verdict forms *the plaintiffs* originally requested will be required. That, to say the least, is ironic.

¶ 63. Moreover, the majority's decision is inconsistent with Wisconsin case law on waiver. In *State v. Aimee M.*, 194 Wis. 2d 282, 533 N.W.2d 812 (1995), the appellant, the mother of three children subject to a CHIPS proceeding, failed to object at trial to the single-question verdict form combining the several jurisdictional bases ' alleged in the CHIPS petition. *Id.* at 286–87. On appeal, however, she "raise[d] a question whether the form of the verdict deprived her of her statutory right to a five-sixths verdict." *Id.* at 295. The supreme court held that although the mother "did not preserve the objection for appeal," a new trial was required "in the interest of justice" because "the form of the verdict misled the jury." *Id.* at 287. The supreme court explained:

> [A]lthough, *as a general rule, failure to object to a jury instruction in timely fashion constitutes waiver* of the objection, *when matters, such as this, which go directly to the integrity of the fact[-]finding process,* are raised on appeal, *the rule is not inflexible and admits of exceptions.* Here, petitioner's objection goes directly to the integrity of the fact-finding process because she contends that she is entitled to a five-sixths verdict on each jurisdictional ground alleged and for which evidence is adduced at trial. By asking the jury to answer only one question when multiple bases for jurisdiction have been alleged, she contends there is no assurance that five-sixths of the jurors agreed to each basis for jurisdiction. Accordingly, we conclude that it is appropriate to consider the merits of her argument.

*Id.* at 295–96 (emphases added; citation omitted).

¶ 64. Here, however, the challenged question did not go "directly to the integrity of the fact-finding process." *See id.* at 296. As the United States Supreme Court recently explained, " 'Unlike the measure of ac-

tual damages suffered, which presents a question of historical or predictive fact, the level of punitive damages is not really a "fact" "tried" by the jury.' " *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 687 (2001) (citation omitted). Accordingly, the "general rule" of waiver applies. *See Aimee M.*, 194 Wis. 2d at 295.

¶ 65. Thus, certain propositions are undeniable:

(1) Generally, failure to object at trial to an alleged five-sixths verdict violation waives appellate challenge. *See id.* at 295.

(2) Despite waiver, an appellate court may order a new trial as a result of a five-sixths verdict violation when the violation goes "directly to the integrity of the fact-finding process." *See id.*

(3) Here, WEPCO failed to object at trial to the alleged five-sixths verdict violation.

(4) Here, the alleged five-sixths verdict violation related only to WEPCO's punitive damages; it did not "go directly to the integrity of the fact-finding process." *See id.*; *see also Cooper Indus.*, 121 S. Ct. at 1686.

(5) Here, therefore, waiver applies.

Accordingly, WEPCO, *the offending party who repeatedly failed 'to object to the five-sixths verdict form and verdict when they could have been corrected,* should not gain a new trial.

## II. Verdict / The Merits

¶ 66. The majority maintains, however, that *Aimee M.* does not control, and that "the facts here fall squarely within the *Seif* and *Westfall* rule" that "per-

mit[s] a party to raise an objection to the erdict for the first time in the motions after verdict." Majority at ¶ 34. I disagree. I believe that *Aimee M.* comes closest to the instant case. *Seif v. Turowski*, 49 Wis. 2d 15, 181 N.W.2d 388 (1970), and *Westfall v. Kottke*, 110 Wis. 2d 86, 328 N.W.2d 481 (1983), dealing with "irreconcilable" and "inconsistent" verdicts, have only the slightest tangential relationship to the issues of this appeal. (In fact, if anything, WEPCO's arguments are undermined by *Westfall*, where the supreme court did not need to address any issue resulting from the five-sixths violation precisely because, "upon return of the verdict," the trial court "immediately re-instructed the jury and gave the jury the opportunity to reconsider its action." *Westfall*, 110 Wis. 2d at 98.)

¶ 67. But even if, as the majority maintains, "the *Seif* and *Westfall* rule" applies (and it is undisputed that *Seif* and *Westfall* allow for appellate consideration of a challenge to verdicts even when no objection is made until post-verdict motions), then, under *Seif* and *Westfall*, we would be considering not whether a five-sixths verdict violation occurred, but rather, whether the verdicts were fatally inconsistent.

¶ 68. "When reviewing a jury verdict to determine whether it is fatally inconsistent, [we] will uphold the verdict when the record is such that the jury could have made both of the findings that are claimed to be inconsistent." *See Sharp v. Case Corp.*, 227 Wis. 2d 1, 20, 595 N.W.2d 380 (1999). Here, the jury could have done so. As the trial court, denying WEPCO's postverdict motions, explained:

A timely objection would have . . . permitted the Court to consider the positions now urged by the defendant and, if appropriate, take steps to remediate

55

the problem; but the defendant did not make any objection, and such action must be deemed a waiver.

Either the defendant consciously decided not to object[,] to save an objection for post-verdict motions, *or the defendant agreed with the Court that the verdict was not defective.* In either event, the objection is now to no avail. Failure to object at the proper time constitutes waiver.

But more significantly, *I think it's the latter option because there is no fatal defect.* Despite the defendant's argument to the contrary, the dissent of Juror C to Question 21 does not mean that juror did not agree that punitive damages should be awarded. Indeed, given the wording of that question and the wording of Questions 19 and 20, . . . *what we do know is the juror found that the defendant did act in an intentional disregard of the plaintiffs' rights. There were no dissents to either of those questions.*

*Question 21 asked as to the amount to be awarded, and we can only speculate whether Juror C contended a greater or lesser amount was appropriate; thus, there was no dissent as to whether punitive damages should be awarded.*

*Moreover, in reality there was only one dissent on any substantive question.*

. . . .

Here[,] although there were dissents to Questions 1 and 2, *there were no dissents with respect to the questions concerning the plaintiffs' substantive claims of waste, negligence, trespass, et cetera.* On each of these questions, all 14 jurors with the one exception were unanimous. Each time the jurors were asked to assess the evidence and each time they were unanimous in their conclusion. There is no fatal flaw.

56

(Emphases added.) The trial court was correct. Clearly and logically, therefore, the verdicts can be reconciled. Accordingly, even reverting to and applying what the majority terms "the *Seif* and *Westfall* rule," we should conclude that no new trial is needed.

¶ 69. The majority notes that, in *Seif*, the supreme court observed that where " 'the resolution of the inconsistency requires an extensive review of the evidence, the matter may well be considered more judiciously in motions after verdict.' " Majority at ¶ 32. That, of course, is beyond dispute. Here, however, the trial court correctly concluded that the verdicts could be reconciled. Moreover, the supreme court, in allowing that the issue of inconsistent verdicts "may" be considered in motions after verdict, *see Seif*, 49 Wis. 2d at 21, certainly was not encouraging counsel to postpone their objections. After all, as most experienced trial lawyers and judges would warn, precisely because complicated cases tend to generate long and costly trials, trial courts and counsel should be all the more careful in reviewing verdicts when they are returned—when any problems can be addressed—so that long and costly retrials will not be needed. The majority's rule reverses the incentives for careful and cost-effective litigation.

### III. Additional Concerns

¶ 70. The majority correctly observes, "Had the trial court not *sua sponte* combined the separate punitive damages questions into one, there may well have been a valid punitive damages verdict as to G&L," because no jurors dissented on the verdict finding WEPCO liable to G&L. Majority at ¶ 41. Conceivably, therefore, the City and G&L could disagree on how much of the $100,000,000 punitive damages goes to each; but that would be their dispute, not WEPCO's.

Punitive damages are for punishment and deterrence. *See Brown v. Maxey*, 124 Wis. 2d 426, 439–40, 369 N.W.2d 677 (1985) (" 'Punitive damages are properly denominated "smart money" and are designed to hurt in order to punish and deter.' " (alteration and quoted source omitted)). Whether the punitive damages go to one victim or the other is incidental unless *the victims* complain. A retrial on punitive damages throws out the victims' innocent babies with WEPCO's toxic bath water.

¶ 71. Accordingly, although I concur on certain issues, I conclude that no new trial is needed and, therefore, I also respectfully dissent.[1]

---

[1] Although I also agree with the majority's conclusion that the trial court erred in ordering, as a sanction, that WEPCO must not pursue insurance coverage for the punitive damages award, I do not join in the balance of the majority's discussion of the other sanctions. These additional sanctions, however, need not be addressed if, as I have concluded, no new trial would be required.

Still, I do note that the majority has addressed a particularly intriguing issue that would have a significant bearing on any punitive damages retrial—whether evidence of insurance coverage for punitive damages is inadmissible. Thus, I also offer some thoughts that, hopefully, will aid the analysis should this appeal find further review.

The majority maintains that the rule precluding "[e]vidence that a person was or was not insured against liability . . . upon the issue whether the person acted negligently or otherwise wrongfully," under WIS. STAT. § 904.11, encompasses punitive damages and that the statute's rationale "applies as well to punitive damages questions." Majority at ¶ 48. Perhaps, but in at least three ways, the majority's conclusion may stand on shaky ground.

First, the majority maintains that the rationale for WIS. STAT. § 904.11—"the legislature's concern in preventing a jury

from knowing of any liability insurance is that the jury may be swayed by the existence of insurance, sensing a greater ability to pay, when considering damage questions," Majority at ¶ 48—applies to punitive damages. But why? Punitive damages punish and deter. In determining the amount of *punitive* damages, a jury attempts to punish and deter the offending party (and deter others, perhaps), not the party's insurer. Thus, introduction of evidence of insurance for punitive damages may be admissible, serving "another purpose," under WIS. STAT. § 904.11. *See* Gerald R. Powell and Cynthia A. Leiferman, *Results Most Embarrassing: Discovery and Admissibility of Net Worth of the Defendant,* 40 BAYLOR L. REV. 527, 532 (1988) ("Only by informing the jury that the defendant pays punitive, but not actual damages, would the purported goal [of punishment] be achieved."); *see also* 23 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 5364 (1980) (federal rule barring evidence of insurance "does not prohibit the use of evidence of insurance where it is relevant to the question of . . . punitive damages"); *Ayers v. Christiansen,* 564 P.2d 458, 461 (Kan. 1977) ("Evidence of the defendant's financial condition—of which insurance was a part—was relevant to punitive damages.) And whether such evidence is admissible also may depend on whether it is offered in a case-in-chief, or in rebuttal. *See, e.g., Wheeler v. Murphy,* 452 S.E.2d 416, 423–24 (W. Va.1994).

Second, the majority maintains that "insurance coverage is not evidence of wealth." Majority at ¶ 49. Why not? If a jury intends to award punitive damages to punish and deter a party, it needs to know the party's wealth in order to do so fairly. No doubt every juror, in order to punish fairly, would want to know the extent to which the punished party can divert the punitive damages to an insurer. Indeed, WIS JI—CIVIL 1707.1, provides, in part:

> If you determine that punitive damages should be awarded, you may then award such sum as will accomplish the purpose of punishing or deterring wrongful conduct.

59

Factors you should consider in answering this question include:

. . . .

4. the defendant's ability to pay. You may consider the defendant's wealth in determining what sum of punitive damages will be enough to punish the defendant and deter the defendant and others from the same conduct in the future.

Third, the majority maintains that the City and G&L "were not prejudiced by the lack of candor or investigation done by WEPCO in entering into a stipulation that no punitive damages coverage was available" because "no evidence of WEPCO's punitive damages insurance coverage would have gone to the jury." Majority at ¶ 53. But here, the majority simply is confused. In this trial, evidence of insurance—i.e., inaccurate evidence of *non*insurance—*was introduced. See* Powell and Leiferman, 40 BAYLOR L. REV. at 536 ("Lack of insurance should be viewed, then, just as any other net worth evidence. It is little different from proving that a defendant has no money in the bank, no accounts receivable, or no physical assets."). Logically, that evidence of *non*insurance would have led the jury to *reduce* the punitive damages it would have awarded had it known that WEPCO would be able to divert the punitive damages to its insurers.

The majority acknowledges that "no case addresses this issue in Wisconsin." Majority at ¶ 49. Accordingly, I would hope that if the supreme court concludes that, despite WEPCO's waiver, a new trial on punitive damages is required, it also will consider what may be the very sound theories countering the majority's analysis of the admissibility of evidence of insurance coverage for punitive damages.