DIGICORP, INC., a Wisconsin corporation, Plaintiff-Respondent-Cross-Appellant,

The CINCINNATI INSURANCE COMPANY, Intervening-Plaintiff,

v.

AMERITECH CORPORATION, Defendant-Third-Party Plaintiff-Appellant-Cross-Respondent-Petitioner,

Dann KRINSKY, Defendant,

v.

BACHER COMMUNICATIONS, INC., Third-Party Defendant-Respondent.†

DIGICORP, INC., a Wisconsin corporation, Plaintiff,

The CINCINNATI INSURANCE COMPANY, Intervening-Plaintiff,

v.

AMERITECH CORPORATION, Defendant-Third-Party Plaintiff-Respondent-Cross-Appellant-Petitioner,

Dann KRINSKY, Defendant,

v.

BACHER COMMUNICATIONS, INC., Third-Party Defendant-Appellant-Cross-Respondent.

---

† Motion for reconsideration filed.

Supreme Court

*Nos. 01–1833, 01–2258. Oral argument January 23, 2003.— Decided June 3, 2003.*

2003 WI 54

(Also reported in 662 N.W.2d 652.)

33

For Ameritech Corporation there were briefs by *Michael B. Apfeld, Daniel T. Flaherty, Craig A. Kubiak* and *Godfrey & Kahn, S.C.,* Appleton, and oral argument by *Michael B. Apfeld.*

For Bacher Communications, Inc., there was a brief by *Gregory J. Cook, Anthony P. Hahn,* and *Kasdorf, Lewis & Swietlik, S.C.,* Wausau, and oral argument by *Gregory J. Cook.*

For Digicorp, Inc., there was a brief by *Victor E. Plantinga, Douglas W. Rose,* and *Rose & Dejong, S.C.,* Brookfield, and oral argument by *Victor E. Plantinga.*

An amicus curiae brief was filed by *Edward E. Robinson, Charles David Schmidt,* and *Cannon & Dunphy S.C.,* Brookfield, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. N. PATRICK CROOKS, J. Ameritech Corporation (Ameritech) seeks review of a court of appeals'

decision that affirmed the circuit court's judgment, entered on the jury's verdict, awarding damages to Digicorp, Inc., (Digicorp) for Ameritech's breach of contract and intentional misrepresentation. The jury also awarded damages to Bacher Communications, Inc., (Bacher) for Ameritech's intentional misrepresentation made by one Ray Taylor (Taylor), an Ameritech employee.

¶ 2. This court is presented with the question of whether Wisconsin recognizes a fraud in the inducement exception to the economic loss doctrine, and if so, what the elements of that exception are. In addition, we must determine whether one may avoid the application of the economic loss doctrine due to an absence of contractual privity, and whether recovery of the benefit of the bargain is prohibited where a fraud in the inducement exception applies and tort remedies are sought.

¶ 3. We hold that Wisconsin recognizes a narrow fraud in the inducement exception to the economic loss doctrine such as the one adopted in *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich. App. 365, 532 N.W.2d 541 (1995). This rule is not as broad as the rule adopted by the court of appeals in *Douglas-Hanson Co. v. BF Goodrich Co.,* 229 Wis. 2d 132, 598 N.W.2d 262 (Ct. App. 1999), which we reviewed and which resulted in a three-to-three vote on this court and a per curiam opinion,[1] *Douglas-Hanson Co. v. BF Goodrich Co.,* 2000 WI 22, 233 Wis. 2d 276, 607 N.W.2d 621. We hold, consistent with the decision in *Huron Tool,* that the economic loss doctrine acts as a bar

---

[1] Because this court was evenly divided, the court of appeals' decision in *Douglas-Hanson* was affirmed. *See Smith v. State,* 41 Wis. 2d 145, 163 N.W.2d 8 (1968).

where the fraud in the inducement is interwoven with the contract in that it involved matters for which risks and responsibilities were addressed. Such matters must not be extraneous to the contract.

¶ 4. In addition, we hold that the language of *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 573 N.W.2d 842 (1998), is clear that the economic loss doctrine generally precludes recovery in tort for solely economic losses, regardless of whether privity of contract exists between the parties. We also hold that recovery of the benefit of the bargain is not permissible where the fraud in the inducement exception applies and tort remedies are sought.

¶ 5. Accordingly, we reverse the court of appeals' decision and remand to the circuit court for a new trial limited to contract remedies.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶ 6. The factual and procedural background of this case is extensive and complicated. Digicorp, an

---

[2] A majority of this court, Justices Crooks, Prosser and Sykes, rejects the broad exception that the court of appeals adopted in *Douglas-Hanson*. However, because Justice Sykes would not adopt any fraud exception, there is also a majority of this court, Justices Bradley, Bablitch and Sykes, that rejects the narrow exception that was adopted by the *Huron Tool* court. Two Justices, Bradley and Bablitch, dissent stating that the *Douglas-Hanson* exception should apply. A majority holds that a fraud in the inducement exception to the economic loss doctrine exists, but there is an even split as to what the fraud in the inducement exception entails. While four Justices agree that there should be an exception, only two Justices, Crooks and Prosser, agree that the *Huron Tool* exception should be adopted. Chief Justice Abrahamson and Justice Wilcox did not participate in this case.

37

authorized Ameritech distributor,[3] contracted Ameritech for approval to sell Ameritech's calling services and calling plans known as "Value-Link"[4] through a third party, Bacher Communications, which was not an Ameritech-authorized distributor.[5] Digicorp and Bacher, however, had a pre-existing relationship. During the course of discussions with Digicorp, an Ameritech employee, Ray Taylor (Taylor), failed to inform Digicorp that one of Bacher's salesmen, Dann Krinsky (Krinsky) had engaged in fraudulent acts of forging customers' signatures when Krinsky had worked for Northeast Communications (NCS), another authorized Ameritech distributor. (Krinsky was the person who initially approached Bacher with the suggestion that Bacher distribute Ameritech's Value-Link plan through Digicorp.) Unaware of Krinsky's past fraudulent actions, Digicorp entered into an agreement, superseding its earlier one with Ameritech, and incorporating

---

[3] As noted by the court of appeals, because Bacher was not an authorized distributor, it could not receive commissions on the sales of Ameritech products. In order to receive commissions, Bacher was required to enter into a sub-agency agreement with an existing authorized distributor to sell the products under the authorized distributor's agreement. *See Digicorp, Inc. v. Ameritech Corp.*, Nos. 01–1833, 01–2258, unpublished slip op., ¶ 8 (Wis. Ct. App. June 11, 2002).

[4] The court of appeals in their opinion referred to the plan as "Valu-Link;" the actual contract in the record shows it spelled "Value-Link."

[5] The Value-Link plan allows a small business to pay lower per-minute charges for local long distance in exchange for guaranteed minimum usage. If the customer did not use the minimum number of minutes required by the contract by the end of the contract, the customer would be billed the difference between what minutes it actually used and the amount it had agreed to use. *See Digicorp,* ¶ 5 n.2.

Bacher (and its employees) as part of the distribution plan for Ameritech products.

¶ 7. On April 30, 1996, Taylor sent a letter to Digicorp's President, Stewart Clark (Clark), outlining the conditions for that company and Bacher's use of what was referred to as "1099 employees." The letter stated, among other things, that a sales person had to be approved and certified by Ameritech. In addition, the letter said that Ameritech required those sales people to be 1099 employees of the authorized distributor, and to represent themselves as employees of the authorized distributor when they sold Ameritech's services. As such, the letter set forth Ameritech's expectation that Digicorp would be responsible for the actions of its 1099 employees.

¶ 8. On June 1, 1996, Digicorp and Ameritech signed a Non-Exclusive Authorized Distributor Agreement. The agreement contained a provision that either party could terminate the agreement. The agreement contained a specific provision to the effect that Ameritech could terminate the contract without any notice, in the event that Digicorp submitted any sales agreements subsequently found to contain forged customer signatures. This provision was new and had not been included in previous contracts between Ameritech and Digicorp.

¶ 9. Krinsky, through his employment at Bacher, continued to sell Ameritech Value-Link plans as one of Digicorp's 1099 employees. A few weeks later, an Ameritech employee discovered that the customer signatures on two Ameritech contracts submitted by Krinsky were forgeries. Digicorp was notified of the investigation; Krinsky then quit Bacher.

¶ 10. Bacher thereafter retrieved the Ameritech contracts from Krinsky's files and discovered that,

during the two and a half months Krinsky had been employed by Bacher, only two or three of the over 250 Value-Link contracts he sold had genuine signatures. All of the rest were forged. Krinsky was ultimately charged with and convicted of forging contracts, and after pleading no contest was sentenced to six months in jail.[6]

¶ 11. In October 1996, about three months after the forged contracts were first discovered, Ameritech exercised its right under its agreement with Digicorp and terminated Digicorp's status as an Ameritech authorized distributor. Following that, Bacher was unable to sell Ameritech products.

¶ 12. Digicorp thereafter commenced a lawsuit against Bacher to recover damages based on Bacher's hiring and supervision of Krinsky. After Digicorp determined that Ameritech (through Taylor) had been aware of Krinsky's previous forgeries, when he had been employed by another Ameritech distributor, Digicorp filed suit against Ameritech and alleged breach of contract, intentional misrepresentation, strict liability misrepresentation, negligent misrepresentation, and negligence by Ameritech. Digicorp also claimed it was entitled to punitive damages from Ameritech. It dismissed its suit against Bacher.

¶ 13. Ameritech counterclaimed, alleging breach of contract, indemnification, intentional misrepresentation, strict liability misrepresentation, negligent misrepresentation, negligent hiring, training and supervision, and unjust enrichment. In addition, Ameritech filed a third party complaint against Bacher, alleging

___

[6] Evidence at trial showed that Krinsky submitted as many as 400 forged contracts while employed at Northeast Communications (NCS), an authorized Ameritech distributor, and at Bacher.

the same claims it asserted against Digicorp with the exception of its claim for indemnification.

¶ 14. Bacher filed a counterclaim against Ameritech alleging strict liability misrepresentation, negligent misrepresentation, wrongful litigation, negligent hiring and supervision, breach of contract and secret rebates; it did not seek punitive damages.

¶ 15. Thereafter, Ameritech moved for summary judgment arguing, among other things, that all of the pending tort claims were barred by the economic loss doctrine. The circuit court dismissed Digicorp's claims of negligence and Bacher's claims for negligent supervision against Ameritech; however, the court withheld ruling on the economic loss doctrine and allowed the remaining claims to go to trial. During an eight-day trial, Bacher was allowed to amend its pleadings to conform to the evidence claiming against Ameritech on a theory of intentional misrepresentation as well. The circuit court refused to apply the economic loss doctrine and allowed the remaining claims to go to the jury. The circuit court reasoned that Ameritech's fraudulent activities, through Taylor's actions, placed this case within the fraudulent inducement exception to the economic loss doctrine. The circuit court stated:

> Fraud and deceit, it seems to me is the very antithesis of the purposes underlying [the economic loss] doctrine. One who acts fraudulently prevents the parties from freely allocating risk by deceiving the other party about the nature of the risk that is being allocated or even creating the risk after the contract is entered into; it's inimical to the very kind of good faith bargaining that should take place between contracting parties . . . and that the Economic Loss Doctrine is intended to further and protects.

*Digicorp, Inc. v. Ameritech Corp.,* Nos. 01–1833, 01–2258, unpublished slip op., ¶ 39 (Wis. Ct. App. June 11, 2002).

¶ 16. The jury returned a special verdict answering all liability questions in the affirmative and awarding damages. Digicorp was awarded $13,080 for Ameritech's breach of contract, $254,926.83 for Ameritech's intentional misrepresentation, and $139,051 in punitive damages. Bacher was awarded $100,000 for Ameritech's misrepresentation. Ameritech was awarded $46,573.30 for Digicorp's breach of contract and $5,000 for Bacher's negligent hiring, training, and supervision of Krinsky. However, that $5,000 award was "negated by the contributory negligence" found by the jury to have been 20% for Bacher and 80% for Ameritech. *Digicorp,* unpublished slip op., ¶ 33. The circuit court denied all motions after verdict and affirmed the jury's verdict with one, non-material, correction.

¶ 17. Digicorp, Ameritech and Bacher all appealed or cross-appealed, and the appeals were consolidated. The court of appeals agreed with the circuit court and held that Ameritech's fraud, as found by the jury, placed this case within the fraudulent inducement exception to the economic loss doctrine first recognized by the court of appeals in *Douglas-Hanson Co. v. BF Goodrich Co.,* 229 Wis. 2d 132, 149, 598 N.W.2d 262 (Ct. App. 1999). The court of appeals also held that the economic loss doctrine did not apply to the third party cross-respondent, Bacher Communications, because Bacher and Ameritech did not have a contractual relationship; they were not in privity with each other.

¶ 18. The court of appeals reversed the award of damages to Ameritech for Digicorp's breach of contract, but affirmed the judgment in all other respects, thus

allowing recovery of the benefit of the bargain despite application of a fraud in the inducement exception.

¶ 19. Ameritech petitioned this court, and obtained review on September 18, 2002.

¶ 20. This court is presented with the following issues:

> (1) Does Wisconsin law recognize the so-called "fraud exception" to the economic loss doctrine and, if so, what are its elements?
>
> (2) May a subcontractor of the party to whom the alleged misrepresentations were made avoid the operation of the economic loss doctrine because it was not in contractual privity with the party that made the alleged misrepresentation?
>
> (3) Assuming that the economic loss doctrine does not bar a given claim for fraud in the inducement of a contract, may the allegedly defrauded party recover the benefit of the bargain premised upon the continuing vitality of the contract?

¶ 21. With respect to the first issue, we answer in the affirmative. Wisconsin recognizes a narrow fraud in the inducement exception, such as the one adopted in *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich. App. 365, 532 N.W.2d 541 (1995). This exception is not as broad as the one set forth by the court of appeals in *Douglas-Hanson Co. v. BF Goodrich Co.,* 229 Wis. 2d 132, 598 N.W.2d 262 (1999). We hold that, consistent with the on *Huron Tool* decision, the economic loss doctrine acts as a bar where the fraud is interwoven with the contract, and not extraneous to it.

¶ 22. With respect to the second issue, this court answers in the negative. The language in *Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis. 2d 395, 573

43

N.W.2d 842 (1998), is clear. The economic loss doctrine precludes recovery in tort for solely economic losses, regardless of whether privity of contract exists between the parties.

¶ 23. We also answer the third issue in the negative, based on consistent interpretations of Wisconsin case law prohibiting recovery for the benefit of the bargain under the circumstances set forth. Where the fraud in the inducement exception applies, recovery for the benefit of the bargain is not permitted.

¶ 24. Accordingly, we reverse the court of appeals' decision and remand these matters to the circuit court for a new trial on contract remedies.

¶ 25. Petitioner, Ameritech, asks this court to determine what the elements of the fraud exception are, and what measure of damages is available if these elements are satisfied. Ameritech contends that it is "undisputed" that all damages awarded in this case were purely economic. For that reason, Ameritech argues that the court of appeals erred in allowing Digicorp and Bacher to bring claims in tort, while at the same time recovering lost profits predicated on the terms of the very contracts they were simultaneously ignoring in order to pursue tort remedies. Ameritech asserts that the fraud in the inducement exception adopted by the court of appeals in the *Douglas-Hanson* case, and applied by the court of appeals in this case, imperils the basic purpose of the economic loss doctrine in Wisconsin. As such, Ameritech asks this court to reverse the decision of the court of appeals.

¶ 26. Ameritech argues that if Wisconsin law recognizes a "fraud exception" to the economic loss doctrine, the *Huron Tool* fraud in the inducement exception is a better-reasoned rule than the broad rule espoused by the court of appeals, since it allows recov-

44

ery in tort only where the alleged fraud was extraneous to the contract. Such an exception, Ameritech argues, is wholly consistent with the policies underlying the economic loss doctrine.

¶ 27. Finally, Ameritech claims that the alleged misrepresentations in this case were interwoven with the subject matter of the contracts, and therefore, they would not provide a basis for an independent tort claim if this court adopts the narrow *Huron Tool* fraud exception to the economic loss doctrine. In support of this position, Ameritech contends that the parties both expressly and impliedly assigned the responsibility and risk for the 1099 employees in the contracts involved here.

¶ 28. Digicorp, on the other hand, asks this court to affirm the decision of the court of appeals. Digicorp claims that the fraud in the inducement exception to the economic loss doctrine adopted by the court of appeals preserves the distinction between tort and contract law, yet upholds the importance this court has emphasized in regard to parties being truthful and honest in contract negotiations.

¶ 29. Digicorp asserts that it would be unjust to allow Ameritech to benefit from its own fraud by allowing it to recover.

¶ 30. Unlike Ameritech, which argues that the risk of fraud was interwoven into the contract so that the exception to the economic loss doctrine is inapplicable, Digicorp argues that if this court adopts the *Huron Tool* exception, the misrepresentations made by Ameritech were extraneous to the contract, allowing Digicorp to pursue remedies in tort.

¶ 31. Finally, Bacher asserts that the economic loss doctrine is inapplicable to the relationship between Bacher, Digicorp and Ameritech, and therefore, cannot

45

shield Ameritech from its own fraudulent conduct. If this court applies the economic loss doctrine to these facts, Bacher claims it will be left without a remedy.

¶ 32. The facts are undisputed in this case. The question of whether Wisconsin law provides for a fraud in the inducement exception to the economic loss doctrine is a question of law which we review de novo. *First Nat'l Leasing Corp. v. City of Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977).

## II. THE ECONOMIC LOSS DOCTRINE AND ITS UNDERLYING POLICIES

¶ 33. We begin our analysis by discussing the economic loss doctrine and its underlying policies. This court adopted the economic loss doctrine in *Sunnyslope Grading, Inc., v. Miller, Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 437 N.W.2d 213 (1989). The court recognized that the economic loss doctrine is a judicially created doctrine providing that "a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly, as here, where the warranty given by the manufacturer specifically precludes the recovery of such damages." *Id.* at 921.

¶ 34. The economic loss doctrine exists to preserve the distinction between tort and contract law. It "exists to protect the expectations of parties to commercial transactions to allow such parties the freedom to allocate any incidental risks." *City of West Allis v. WEPCO*, 2001 WI App 226, ¶ 16, 248 Wis. 2d 10, 635 N.W.2d 873. In other words, the economic loss doctrine requires transacting parties in Wisconsin to pursue

46

only their contractual remedies when asserting an economic loss claim, in order to preserve the distinction between contract and tort law. As we noted in *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 265, 593 N.W.2d 445 (1999), "[w]e refuse to pass on to society the economic loss of a purchaser such as Wausau Tile who may have failed to bargain for adequate contract remedies."

¶ 35. The underlying policy reasons supporting the economic loss doctrine are set forth in *Daanen & Janssen*, 216 Wis. 2d 395. It is well settled that the economic loss doctrine was created to maintain the fundamental distinction between tort law and contract law; protect commercial parties' freedom to allocate economic risk by contract; and encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.[7]

---

[7] *See Harley-Davidson Motor Co. v. Powersports, Inc.*, 319 F.3d 973 (7th Cir. 2003). While this recent decision of the Seventh Circuit does not address the issue presented in this case, it nevertheless provides an excellent summary of our rationale for the economic loss doctrine. The Seventh Circuit noted that neither *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960 (7th Cir. 2000), *Douglas-Hanson Co. v. BF Goodrich Co.*, 229 Wis. 2d 132, 598 N.W.2d 262 (1999), nor the present case of *Digicorp*, "address[ ] whether a party may *rescind* a contract based on fraudulent inducement or a misrepresentation." *Harley-Davidson, Id.* at 983. As noted by the Seventh Circuit, this court has "acknowledged that Wisconsin would allow such an action for rescission. *Harley-Davidson, Id.* at 983 (citing *Marine Bank, N.A. v. Meat Counter, Inc.*, 826 F.2d 1577, 1588 (7th Cir. 1987)). *See also id.* at 981.

While noting that the rationale behind the economic loss doctrine does not apply to a misrepresentation claim when the

¶ 36. However, there are valid policy reasons why a party engaging in fraud should not be allowed to hide behind the protections of the economic loss doctrine. Wisconsin has a long-standing principle that parties need a background of truth and fair dealing in commercial relationships. *Douglas-Hanson*, 229 Wis. 2d at 144 (citing *Daanen & Janssen*, 216 Wis. 2d at 407, 573 N.W.2d at 848.

¶ 37. Furthermore, "[a] party to a business transaction is under a duty to disclose facts basic to the transaction if he knows the other is about to enter into it under a mistake as to them, and the other party could reasonably expect a disclosure of those facts. *Douglas-Hanson* at 144 (citing *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95, 105 (1980)).[8]

¶ 38. Consistent with the above principles and policies, Wisconsin law does not reward intentional misrepresentations and bad faith dealings.

---

remedy sought is rescission of contract, the *Harley-Davidson* opinion went on to summarize the economic loss doctrine and its underlying policies:

> [a]pplication of the economic loss doctrine to tort actions between commercial parties is generally based on three policies . . . : (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*Harley-Davidson, Id.* at 985 (citing *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 573 N.W.2d 842 (1998)).

[8] Based on the above principles of good faith and fair dealing, the economic loss doctrine is not applied to pre-contract negotiations, as it would frustrate those principles. *See Budgetel Inns, Inc. v. Micros Sys., Inc.*, 8 F. Supp.2d 1137, 1148 (E.D. Wis. 1998).

48

¶ 39. According to *Douglas-Hanson,* Wisconsin law does not allow the party perpetrating the fraud to hide behind contractual remedies. *Douglas-Hanson* at 148–50. In *Douglas-Hanson,* the court of appeals adopted a broad exception permitting tort claims to be asserted whenever the contract was induced by fraud. The court held that the economic loss doctrine did not preclude the plaintiff's claim for intentional misrepresentation, when the misrepresentation fraudulently induced the plaintiff to enter into the contract. *Douglas-Hanson,* 229 Wis. 2d at 137–38. In that case, the court of appeals reasoned that when an intentional misrepresentation fraudulently induces a party to enter into a contract, the parties appear to negotiate freely; but, in fact, one party's ability to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent conduct. *Id.* at 146. Similarly, the United States District Court in *Budgetel* said that "contract negotiations that begin with the assumption that the other party is lying will hardly encourage free and open bargaining." *Budgetel,* 8 F. Supp.2d at 1148.

¶ 40. On appeal, this court was evenly split, in reviewing the *Douglas-Hanson* decision, on whether there should be a fraud in the inducement exception to the economic loss doctrine. Consequently, the precise issue of whether a fraud in the inducement exception to the economic loss doctrine is recognized in Wisconsin was left open to further debate by our split decision in *Douglas-Hanson.*

¶ 41. In *Northridge Co. v. W.R. Grace & Co.,* 162 Wis. 2d 918, 471 N.W.2d 179 (1991), this court "dr[ew] the line between economic and non-economic loss". *Home Valu, Inc. v. Pep Boys,* 213 F.3d 960 (7th Cir. 2000). In *Northridge,* this court adopted a narrow public safety exception to the economic loss doctrine. In

49

that case, the defendant sold a fireproofing material containing asbestos to the plaintiff's contractor for use in the construction of the plaintiffs' shopping centers. The plaintiffs sued for breach of warranty, strict products liability and negligence, claiming that the asbestos "presented unreasonable danger to persons and property." *Northridge,* 162 Wis. 2d at 922. The plaintiffs sought to recover the amounts it had expended in inspecting the building and removing the asbestos. The defendant argued that the tort claims were barred by the economic loss doctrine. *Id.* at 929–30. This court agreed with other jurisdictions, which permit tort recovery for asbestos damage to buildings. The plaintiffs in that case, Northridge Company and Southridge Company, filed a complaint alleging breach of warranty and several tort claims, based on the defendant's sale of the fireproofing material to the plaintiffs' general contractor for use in the construction of the plaintiffs' shopping centers. The complaint alleged that the fireproof material was "in a defective condition and, because it contains asbestos, presented unreasonable danger to persons and property." In addition, the plaintiffs asserted that the asbestos contaminated the building and, as a result, the plaintiffs suffered damages by incurring expenses for inspection, testing and removal of the fireproofing material, and because of diminished value of the property. In response to the plaintiffs' complaint, we said:

> We conclude that the complaint in this case can be interpreted as alleging that a defect in the product has caused physical harm to property, property other than the product itself. The alleged physical harm to other property consists of the contamination of the plaintiffs' buildings with asbestos from the defendant's product, posing a health hazard.

50

*Northridge,* 162 Wis. 2d at 923.

¶ 42. Based on our decisions, the United States Court of Appeals for the Seventh Circuit in *Cooper,* predicted that the Wisconsin Supreme Court "would not allow a negligence or strict liability misrepresentation claim seeking to recover economic damages." *Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co.,* 123 F.3d 675, 682 (7th Cir. 1997) (citing *Badger Pharmacal, Inc. v. Colgate-Palmolive Co.,* 1 F.3d 621, 628 (7th Cir. 1993)).

¶ 43. Accordingly, the court in *Cooper* concluded that there was "no basis for treating [ ] intentional misrepresentation claim[s] [ ] differently" than other misrepresentation claims applying the economic loss doctrine. *Id.* at 682.

¶ 44. Similarly, in *Pep Boys,* the Seventh Circuit cited *Badger Pharmacal* in analyzing Wisconsin law:

> In *Badger Pharmacal,* we applied Wisconsin law and reasoned that " 'tort law provides no remedy in a case in which the plaintiff is seeking to recover for a commercial loss rather than damage to person, property, or reputation' ".

*Pep Boys,* 213 F.3d at 964.

¶ 45. In arriving at that conclusion, the court noted that:

> Wisconsin's highest court draws the line between economic and non-economic loss by emphasizing that economic loss is damage "which does not cause personal injury or damage to other property." In contrast, non-economic damages, which are recoverable in tort, involve some "physical harm" or other "unreasonable risk of injury to person or property.

*Pep Boys,* 213 F.3d at 963 (citing *Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis. 2d 395, 573 N.W.2d

842, 845 (1998), and *Northridge Co. v. W.R. Grace and Co.,* 162 Wis. 2d 918, 471 N.W.2d 179, 185 (1991)). The court predicted: "We therefore adhere to our view that the Wisconsin Supreme Court would not recognize tort claims for negligent or strict responsibility misrepresentation . . . ." *Pep Boys,* 213 F.3d at 964.

¶ 46. Decisions from the United States District Court for the Eastern District of Wisconsin have recognized an exception to the economic loss doctrine for fraudulent inducement claims, but only when the claim is extraneous, rather than "interwoven" with the subject matter of the contract. *Raytheon Co. v. McGraw-Edison Co.,* 979 F. Supp. 858, 870 (E.D. Wis. 1997). *See also Ice Bowl L.L.C. v. Weigel Broad. Co.,* 14 F. Supp. 2d 1080, 1083 (E.D. Wis. 1998).

¶ 47. Similarly, a Michigan court of appeals, prior to the *Raytheon* and *Ice Bowl* decisions, recognized a narrow fraud exception to the economic loss doctrine where the fraud is extraneous to, rather than interwoven with, the contract. *Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.,* 209 Mich. App. 365, 367, 532 N.W.2d 541, 543 (1995). In defining extraneous versus interwoven, the *Huron Tool* court said that extraneous fraud concerns those matters whose risk and responsibility were not expressly or impliedly dealt with in the contract.[9]

---

[9] We take strong issue with the broad, sweeping assertion in the dissent that "the *Huron* limitation fatally undermines the viability of the tort of fraud in the inducement." *See* ¶ 86 of the dissent. The fraud exception to the economic loss doctrine that we adopt is not dead on arrival. We expect that, through the years, there indeed will be circumstances where there is extraneous fraud, concerning matters whose risk and responsibility were not expressly or impliedly dealt with in the contract.

¶ 48. *Huron Tool* involved the sale of a computer software system between two commercial parties. The plaintiff in *Huron Tool* asserted various claims, including fraud, based on alleged defects in the software system. *Id.* The *Huron Tool* court recognized and approved a fraud in the inducement exception to the economic loss doctrine. The court declined to adopt the defendant's position that the economic loss doctrine precludes *any* fraud claim. Instead, the court stated that:

> [f]raud in the inducement presents a special situation where parties to a contract appear to negotiate freely —which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.

*Id.* at 372–73.

¶ 49. Turning to the facts of this case, as noted above, Ameritech argues that Wisconsin should recognize the narrow fraud in the inducement exception of *Huron Tool,* rather than the broad exception from the court of appeals' decision in *Douglas-Hanson,* which permits tort claims to be asserted whenever the contract in question was induced by fraud.

¶ 50. Digicorp agrees with Ameritech on this point, maintaining that public policy supports a narrow fraud in the inducement exception to the economic loss doctrine, because it promotes honesty, good faith and fair dealing during contract negotiations. Relying on the policies set forth in *Douglas-Hanson* and *Budgetel,*

Digicorp reiterates that there can be no effective bargaining if contract negotiations begin with the assumption that the other party is lying.

¶ 51. As noted previously, we hold that there is indeed a fraud in the inducement exception to the economic loss doctrine. However, that exception is not as broad as the rule set forth by the court of appeals' decision in *Douglas-Hanson.* Instead, we adopt the narrow approach set forth in *Huron Tool,* and overrule the *Douglas-Hanson* decision to the extent that it is contrary to that narrow exception. The fraud in the inducement exception we adopt is wholly consistent with the policies underlying the economic loss doctrine.

¶ 52. The fraud in the inducement exception we adopt is very narrow, and does not nullify the economic loss doctrine. It seems clear that, generally, in order for the fraud in the inducement exception to apply, the misrepresentation would have occurred before the formation of the contract. In addition, to constitute deceit or intentional misrepresentation, a plaintiff would have to prove the five elements set forth in the case law and in Wisconsin Civil Jury Instruction 2401.[10] Those five elements would have to be proved by "clear, satisfactory,

---

[10] See the cases cited herein in the discussion of Wisconsin Civil Jury Instruction 2401: Misrepresentation: Intentional Deceit. The five elements are:

1. The defendant made the representation of fact. *See Killeen v. Parent,* 23 Wis. 2d 244, 127 N.W.2d 38 (1964).

2. Such representation of fact was untrue.

3. Such untrue representation was made by the defendant knowing the representation was untrue or recklessly without caring whether it was true or false. *See Stevenson v. Barwineck,* 8 Wis. 2d 557, 99 N.W.2d 690 (1959) (representations without sufficient basis are reckless).

and convincing evidence." *See* Wisconsin Civil Jury Instruction 205, Burden of Proof: Middle, and *see Nommensen v. American Continental Ins. Co.,* 2001 WI 112, 246 Wis. 2d 132, 629 N.W.2d 301. The underlying purposes of the economic loss doctrine are preserved, since the exception is a narrow one that maintains the distinction between contract and tort remedies in most situations.

## III. APPLICATION OF *HURON TOOL EXCEPTION*

■

¶ 53. Having determined the proper analytical framework for evaluating claims of fraud in the inducement, we now turn to the facts of this case. Our task is to determine whether the fraud involved matters for which risks and responsibilities were extraneous to, or interwoven into, the contract. As discussed in detail below, the alleged misrepresentations in this case were interwoven with the subject matter of the contracts. Therefore, they do not provide a basis for an independent claim under the narrow *Huron Tool* fraud in the inducement exception to the economic loss doctrine.

¶ 54. The subject of the alleged misrepresentation in this case does not involve the actual Value-Link service, but instead, deals with the responsibility and risk of the 1099 employee, Krinsky.

¶ 55. Here, we find that based on the evidence in the record, the fraud involved matters for which risks

---

4. That the representation was made with intent to deceive and induce the plaintiff to act upon it to the plaintiff's pecuniary damage. *See Household Finance Corp. v. Christian,* 8 Wis. 2d 53, 98 N.W.2d 390 (1959).

5. That the plaintiff believed such representation to be true and relied on it. *See Household Finance Corp. v. Christian,* 8 Wis. 2d 53, and *Miranovitz v. Gee,* 163 Wis. 246, 157 N.W. 790 (1916).

and responsibilities were interwoven into the contract. It is clear from the record that the parties expressly and impliedly assigned and allocated the responsibilities and risks for the 1099 employees.

¶ 56. First, The Digicorp Fox Valley Division Sales Program Agreement Section Five states:

> Conduct of employees—DIGICORP reserves the right to approve all individuals engaged by Contractor in the sale and marketing of Ameritech services covered by this agreement. DIGICORP'S reputation in the industry is mutually agreed to be a valuable asset. *If DIGICORP becomes aware of any representations not in conformity with this agreement or sales activities deemed harmful to its reputation or business interests, we will immediately advise Contractor.* Contractor agrees to take corrective action, up to and including termination of the employee, to expeditiously address the improper activities or representations. Continuation or recurrence of unacceptable activities will be deemed a material breach of this agreement.

Pet'r App. to Opening Br. of Pet. Ameritech at 043 (emphasis added). Section Five of the Sales Program Agreement illustrates that Digicorp, during pre-contract negotiations, anticipated and allocated the risks and responsibilities associated with entering into an agreement with Ameritech.

¶ 57. Second, the letter from Taylor to the President of Digicorp, Clark, lists the duties and responsibilities of Ameritech and Digicorp 1099 employees. In particular, the letter unequivocally sets forth the criteria that must be met for an Ameritech Authorized Distributor to use sales people employed by another

company to sell Ameritech services.[11] In addition to the list of criteria, Taylor included the following statement in the letter:

> I want to make it clear that Ameritech holds its' [sic] Authorized Distributors responsible for the actions of 1099 sales representatives.
>
> Any activity by a 1099 sales person, as with any other sales representative, that is contrary to the standards established by Ameritech, will place in jeopardy your status as an Ameritech Authorized Distributor.

The detailed discussion included in this letter demonstrates that both Ameritech and Digicorp understood the terms of their agreement, and had an opportunity to allocate the risks involved during contract negotiations.

¶ 58. Finally, the June 1996 Non-Exclusive Authorized Distributor Agreement between Ameritech

---

[11] The following criteria were set forth in the letter from Taylor to the President of Digicorp:

- The sales people involved *must* be 1099 employees of the Authorized Distributor.

- The sales people *must* be registered with Ameritech as sales people through the Authorized Distributor. Sales people cannot be concurrently registered with more than one Ameritech Authorized Distributor.

- Each sales person *must* be approved and certified by Ameritech.

- Each sales person *must* represent themselves as an employee of the Authorized Distributor when selling Ameritech services and products.

- Each sales person will present potential customers with a business card that identifies them as a representative of the Ameritech Authorized Distributor. This business card would include the Authorized Distributor company name and if desired Ameritech identification that conforms to Ameritech Corporate guidelines.

and Digicorp, clearly sets forth in Section 5.01 what happens if forged signatures are discovered. Section 5.1(c) states in relevant part:

> Notwithstanding 5.1(a) and (b) above, it is agreed that Ameritech may terminate this Agreement without notice in the event of . . . submission of any sales agreement by the AD, any of its representatives, or its agents which is *subsequently found to contain forged customer signatures* or of which the customer denies any knowledge of placing an order with AD.

In addition, Sections 1.3 and 6.4 refer to aspects of forgery.[12]

---

[12] 1.3 *Subdistributors.* The AD [Authorized Distributor] acknowledges that only those distributors who are specifically and directly authorized in writing by Ameritech are permitted to function and represent themselves as Ameritech Authorized Distributors. The AD shall not appoint or in any way authorize anyone to distribute or represent themselves as authorized to distribute or sell as an agent or "authorized" Ameritech Distributor, and AD shall not sell Products to any such distributor, representative or agent nor shall AD process orders with Ameritech for network service products marketed or sold by any such distributor, representative or agent unless such person(s) have been certified under standards solely set by Ameritech, and the individual has been registered by Ameritech, and such authorization shall have been previously and expressly approved in writing by Ameritech. *In the event that AD violates this provision, Ameritech shall have the right, in addition to any other right that Ameritech may have, to terminate this Agreement immediately.* (Emphasis added.)

6.0 AUTHORIZED DISTRIBUTOR DUTIES.

. . . .

6.4 AD agrees that Ameritech's business reputation is one of it's [sic] most valuable assets. Distributor will always employ a high degree of integrity in selling to it's [sic] customers and *will not, by act or omission, tarnish that reputation.* AD agrees to comply at all times with Ameritech Authorized Distribution Code

¶ 59. The entire relationship among Ameritech and Digicorp and Bacher was governed by contract. There was a pre-existing authorized distributorship agreement between Ameritech and Digicorp going back to 1993. Next, the April 30, 1996 letter sets forth the "certify and approval" condition, while emphasizing Digicorp's responsibility for the actions of the 1099 employees. Finally, the June 1996 contract covers a whole variety of duties and responsibilities, and expressly provides explicit terms for termination. It references Ameritech's policies with regard to forgery, and the Authorized Distributor, Digicorp's, duties with regard to forgery. The duties, responsibilities and risks of both Ameritech and Digicorp were set forth in great detail. The parties clearly allocated, by use of the contract terms, the risks and responsibilities of entering into the agreement.

¶ 60. It is clear from this information that the parties expressly and impliedly assigned responsibility and risk for the 1099 employees—the subject of the alleged misrepresentation.

of Business Conduct incorporated by reference herein as Annex E, which may be modified by Ameritech from time-to-time and such modification shall be construed as if set forth originally herein. In addition, AD agrees to:

(a) *Not mislead customers either by advertising, oral statement, or otherwise;*

(b) *Not use Ameritech's brand to entice, for bait and switch, or any similar purposes.*

(c) *Not refer to or in any way disparage other Ameritech Distributors in advertising or promotional materials, or at any time during the selling process whether in oral or written communications to any potential or existing Ameritech customer.*

(Emphasis added.)

¶ 61. Contrary to Digicorp's argument, the June 1996 contract between Digicorp and Ameritech was not a new contract, but a modification of a prior one. It was a routine renewal of a pre-existing contract. Even assuming, arguendo, that the misrepresentation made by Taylor with regard to knowledge of Krinsky's past fraudulent behavior, was a material inducement to Digicorp to enter into its replacement agreement with Ameritech, it was part and parcel of an overall allocation of risks and responsibilities for 1099 employees.

¶ 62. This information shows that the alleged misrepresentations by Taylor were interwoven with the subject matter of the contract. The alleged fraud here is similar to the fraudulent misrepresentation made to the plaintiff in *Huron Tool*. The misrepresentations concerned matters related to the performance of the contract itself, and as such, cannot be found to be extraneous to the contractual dispute. Accordingly, Digicorp is limited to contract remedies. *See Huron Tool*, 532 N.W.2d at 546. The fraud in the inducement exception to the economic loss doctrine is inapplicable under these circumstances.

## IV. CONTRACTUAL PRIVITY

¶ 63. Our analysis does not end with the analysis of the economic loss doctrine and the *Huron Tool* exception in regard to the facts presented. We must also consider whether a subcontractor of the party to whom the alleged misrepresentations were made avoids the operation of the economic loss doctrine, because it was not in contractual privity with the party allegedly engaging in fraud.

¶ 64. Ameritech argues that Bacher should not be able to escape application of the economic loss doctrine just because there was no privity between them.

¶ 65. We answered the question in *Daanen & Janssen,* 216 Wis. 2d 395, and unequivocally held there that even in the absence of privity, the economic loss doctrine bars one party in the distributive chain from recovering economic losses in tort from another party in that chain. *See also Cooper,* 123 F.3d 675 at 681 (citing *Miller v. United States Steel Corp.,* 902 F.2d 573, 575 (7th Cir. 1990)). For the reasons discussed herein, the economic loss doctrine applies to Bacher as well, and the fraud in the inducement exception is not applicable to its claims.

¶ 66. With regard to Bacher, it is important to note that it hired Krinsky before any representation was made by Ameritech. Under the facts of this case, Digicorp, an authorized Ameritech distributor, contacted Ameritech for approval to sell Ameritech's calling services and calling plans known as "Value-Link" through the third party, Bacher Communications. Bacher was not an Ameritech-authorized distributor. Even though Taylor failed to inform Digicorp during these discussions that Krinsky had engaged in fraudulent acts of forging customers' signatures when Krinsky had worked for another authorized Ameritech distributor, by that time Krinsky was already employed by Bacher. He was so employed before Digicorp and Ameritech had entered into the agreement for Digicorp to sell the Value-Link system through Bacher.

## V. DAMAGES—ELECTION—BENEFIT OF BARGAIN

¶ 67. The court of appeals decision allowed Digicorp and Bacher to avoid the contract, but at the same time use the contract to recover the benefit of the bargain related to the contract that they had repudiated. As noted above, the application of the fraud in the inducement exception to the economic loss doctrine renders the underlying contract voidable, and gives the defrauded party the option of electing either tort or contract damages. *See Douglas-Hanson,* 229 Wis. 2d at 145. Thus, allowing Digicorp and Bacher to avoid the contract, but recover the benefit of the bargain contravenes not only the logic of the fraud exception, but the core principles of the doctrine of election of remedies. The decision in *First Nat'l Bank & Trust Co. v. Notte* states that where grounds for avoidance of a contract exist, the aggrieved party must elect between rescinding the contract, or affirming the contract and seeking damages. *First Nat'l Bank & Trust Co. v. Notte,* 97 Wis. 2d 207, 225, 293 N.W.2d 530 (1980). This court has consistently applied the rule that a party may not seek to set aside a contract on the basis of fraud and at the same time recover the benefit of the bargain. *Head & Seemann, Inc. v. Gregg,* 107 Wis. 2d 126, 127, 318 N.W.2d 381 (1982).

## VI. CONCLUSION

¶ 68. For the reasons set forth above, we hold that Wisconsin recognizes a narrow fraud in the inducement exception to the economic loss doctrine. Consistent with the exception adopted in *Huron Tool,* we hold that the evidence in the record shows that the alleged fraud in the present case involved matters for which risks and

responsibilities were interwoven into the contract. As such, the economic loss doctrine acts as a bar, and the parties are limited to contractual remedies.

¶ 69. Additionally, we hold that the language of *Daanen & Janssen* is clear that the economic loss doctrine generally precludes a recovery in tort for solely economic losses, regardless of whether privity of contract exists between the parties.

¶ 70. We also hold that recovery of the benefit of the bargain is prohibited where the fraud in the inducement exception applies, and tort remedies are sought.

¶ 71. Accordingly, we reverse the court of appeals' decision and remand to the circuit court for a new trial limited to contract remedies.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 72. SHIRLEY S. ABRAHAMSON, C.J., and JON P. WILCOX, J., did not participate.

¶ 73. DIANE S. SYKES, J. *(concurring in part, dissenting in part).* I would not adopt a fraud exception to the economic loss doctrine. The economic loss doctrine precludes commercial contracting parties from recovering tort damages for purely economic losses associated with the contract relationship. That is, the doctrine restricts commercial contracting parties to contract remedies when they allege an economic loss stemming from the contract relationship.[1]

---

[1] In *Danaan & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 414–15, 573 N.W.2d 842 (1998), this court held that the economic loss doctrine applies in the absence of privity of contract: "whether or not privity of contract exists between the

¶ 74. As the lead opinion notes, the economic loss doctrine promotes three important policies: 1) it preserves the fundamental distinction between contract and tort law; 2) it protects the freedom of commercial contracting parties to allocate economic risk by contract; and 3) it encourages the parties best situated to assess the risk of economic loss—the contracting parties themselves—to assume, allocate, or insure against that risk. Lead op., ¶ 35. *See also Wausau Tile, Inc. v. County Concrete Corp.,* 226 Wis. 2d 235, 247, 593 N.W.2d 445 (1999) (citing *Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis. 2d 395, 403, 573 N.W.2d 842 (1998)).

¶ 75. "From its inception the economic loss doctrine has been based on an understanding that contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena." *Danaan & Janssen,* 216 Wis. 2d at 403–04. The distinction between contract and tort law is based fundamentally on their different concepts of duty: "contract law rests on bargained-for obligations, while tort law is based on legal obligations." *Wausau Tile,* 226 Wis. 2d at 247. These differences in the source and nature of duty in contract and tort law produce different rules regarding remedy and damages (punitive damages are not recoverable in contract actions, for example), and the economic loss doctrine exists in large part to keep each in its proper sphere.

¶ 76. The creation of a fraud exception to the economic loss doctrine undermines these important

parties, a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under tort theories of negligence or strict liability." *Id.* at 414–15. I agree with the majority's extension of this holding to the distributor/subdistributor here. Lead op., ¶¶ 63–66.

purposes and distinctions. A contracting party who alleges that he was fraudulently induced to enter into the contract already has adequate contract remedies: he can affirm the contract and seek damages for breach, or he can pursue the equitable remedy of rescission and seek restitutionary damages. *See Harley-Davidson Motor Co. v. Powersports, Inc.,* 319 F.3d 973, 978 n.7 (7th Cir. 2003) (collecting Wisconsin cases and holding that the economic loss doctrine does not apply to an equitable action in contract for rescission/restitution). A contract fraudulently induced is void or voidable; a party fraudulently induced to enter into a contract "has the election of either rescission or affirming the contract and seeking damages." *First Nat'l Bank & Trust Co. of Racine v. Notte,* 97 Wis. 2d 207, 225, 293 N.W.2d 530 (1980); *see also Eklund v. Koenig & Assocs.,* 153 Wis. 2d 374, 381, 451 N.W.2d 150 (Ct. App. 1989) ("When a party discovers an alleged fraud . . . he may affirm the contract and sue for damages, or he may disaffirm and seek restitution."). This election of remedies requirement does not confer upon the aggrieved party the option of pursuing either contract or tort remedies, but, rather, involves a choice between two different contract remedies: damages for breach or rescission/restitution.[2]

¶ 77. *Notte* was decided before this court adopted the economic loss doctrine in *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 437

---

[2] Restitutionary damages are recoverable in an equitable action in contract for rescission of a contract fraudulently induced. *Head & Seemann, Inc. v. Gregg,* 104 Wis. 2d 156, 166–67, 311 N.W.2d 667 (Ct. App. 1981). These include " 'any sums that are necessary to restore [the party fraudulently induced] to his position prior to the making of the contract.' " *Id.* at 166.

N.W.2d 213 (1989). In *Notte,* this court specifically distinguished between tort remedies for misrepresentation, and contract remedies for breach or rescission in the context of a fraudulently induced contract. *Notte,* 97 Wis. 2d at 212–14. The court concluded that tort remedies are inapplicable, and required an election of remedies in contract. *Id.* at 225–26.

¶ 78. The court of appeals' decision in *Douglas-Hanson Co. v. BF Goodrich Co.,* 229 Wis. 2d 132, 598 N.W.2d 262 (Ct. App. 1999), was based in part upon a misinterpretation of the election of remedies doctrine. There, the court held that "[t]he economic loss doctrine does not apply to fraudulently induced contracts because the person fraudulently induced to enter the contract can affirm or avoid the contract, and in so electing, has the option of selecting tort or contract damages." *Id.* at 145. But the election to either affirm or rescind a fraudulently induced contract is an election between two different *contract* remedies, one at law for breach and the other in equity for rescission and restitution; it is not an election between tort and contract remedies. *Notte,* 97 Wis. 2d at 225–26.

¶ 79. While the lead opinion partially overrules *Douglas-Hanson* and prefers a narrower fraud exception than that articulated by the court of appeals, lead op., ¶ 51, it nevertheless perpetuates that decision's conceptual confusion. Lead op., ¶ 67. The lead opinion concludes that there is a fraud in the inducement tort but disallows benefit-of-the-bargain tort damages. *See* Wis JI—Civil 2405. The lead opinion apparently restricts recovery in this new tort to that which would be allowed in an equitable action in contract for rescission and restitution, although it does not directly say so.

¶ 80. I certainly do not disagree with this outcome, because I would leave the parties to their con-

tract remedies in the first place. However, the lead opinion's hybrid cause of action blurs rather than preserves the distinction between tort and contract remedies.

¶ 81. The lead opinion's narrow fraud exception does less damage to the second and third purposes underlying the economic loss doctrine, because it bars a tort claim for fraud in the inducement concerning matters that are "interwoven with" or "expressly or impliedly dealt with in the contract." Lead op., ¶¶ 47–48. I agree that the facts of this case do not support a claim under the lead opinion's narrow exception to the economic loss doctrine. As a general matter, however, we should refrain from attempting to articulate new legal rules where the factual predicates to do so are not present in the case. *See Bicknese v. Sutula,* 2003 WI 31, ¶ 66, 260 Wis. 2d 713, 660 N.W.2d 289 (Sykes, J., dissenting). Articulating a new common law rule when the facts of the case do not warrant doing so is essentially an exercise in hypothetical decisionmaking.

¶ 82. The facts of this case do not warrant the creation of a fraud-in-the-inducement exception to the economic loss doctrine, even one that is narrowly drawn. Digicorp had a pre-existing, ongoing, terminable-at-will distributorship agreement with Ameritech, and there is no evidence that the June 1, 1996, renewal of that agreement was induced by Ameritech's failure to disclose what it knew about the past forgeries of an employee that Digicorp's subdistributor, Bacher, had already hired. That is, there is no causal link between the fraudulent nondisclosure and the June 1, 1996, contract, the termination of which provided the premise for the award of lost profits and punitive damages in this case. There is no factual basis

67

for the recognition of a fraud exception to the economic loss doctrine in this case, but the lead opinion purports to recognize one anyway.[3]

¶ 83. Contracting parties can protect themselves against economic losses associated with pre-contract misrepresentations by appropriate contract language, and, in the event that one party's fraud frustrates the other party's ability to do so, contract law renders the contract voidable at the option of the aggrieved party and allows recovery of restitution. I would not adopt a fraud-in-the-inducement exception to the economic loss doctrine. In other respects, I concur in the majority opinion.

¶ 84. ANN WALSH BRADLEY, J. *(dissenting)*. Typically, when you narrow the viability of a cause of action, you chip away at the edges while being careful to preserve its core essence. However, by endorsing the *Huron* limitation, the lead opinion eviscerates the core of the tort of fraud in the inducement while purportedly leaving the edges of this cause of action intact. Because the *Huron* limitation essentially eliminates the viability of the tort of fraud in the inducement and undermines the purpose of the economic loss doctrine, I respectfully dissent.

¶ 85. While I agree with the lead opinion that there is a fraud in the inducement exception to the economic loss rule, I disagree with the lead opinion's

---

[3] Because of the nonparticipation of two justices and the split decision among the participating justices, this case accomplishes only the rejection of the broad fraud-in-the- inducement exception contained in *Douglas-Hanson Co. v. BF Goodrich Co.,* 229 Wis. 2d 132, 598 N.W.2d 262 (Ct. App. 1999). Neither the broad nor the narrow fraud exception has the support of a majority of this court.

endorsement of the limitation on that exception set forth in *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541, 543 (Mich. App. 1995). Like the court of appeals, I would uphold the rule set forth in *Douglas-Hanson Co. v. BF Goodrich Co.*, 229 Wis. 2d 132, 138–139, 598 N.W.2d 262 (Ct. App. 1999), that "the economic loss doctrine does not preclude a plaintiff's claim for intentional misrepresentation when the misrepresentation fraudulently induces a plaintiff to enter into a contract."

¶ 86. The lead opinion rejects the rule established in *Douglas-Hanson* and concludes that the economic loss doctrine acts as a bar to a fraud in the inducement tort claim only in those circumstances where the fraud is "interwoven" with the contract, and not extraneous to it. Lead op., ¶ 21. However, the lead opinion fails to acknowledge that the *Huron* limitation fatally undermines the viability of the tort of fraud in the inducement. The court in *Budgetel Inns, Inc. v. Micros Systems, Inc.*, 8 F. Supp. 2d 1137, 1146 (E.D. Wis. 1998), acknowledged this fatal flaw when it explained that the *Huron* limitation essentially eliminates the fraud in the inducement exception:

> In practice, the *Huron* limitation renders the fraud in the inducement exception a nullity. The *Huron* limitation to the fraud in the inducement exception is so broad that it swallows the exception whole.
>
> In all cases cited by the parties and researched by the court, use of the *Huron* limitation eliminated the claims of fraud in the inducement. For instance, after discussing the fraud in the inducement exception with the *Huron* limitation, the *Huron* court itself found that the plaintiff's fraud claim was not viable apart from its contract claims . . . ."

¶ 87. Black's Law Dictionary defines "fraud in the inducement" as "fraud occurring when a misrepresentation leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved." *Black's Law Dictionary* 671 (7th ed. 1999). As this definition reflects, the core of a fraud in the inducement action addresses misrepresentations regarding the risks, duties or obligations to be set forth in, and therefore "interwoven" with, a contract. It is hard to see how any of this core can survive under the lead opinion's formulation of the rule which bars a fraud in the inducement action where the fraud "is interwoven with the contract in that it involved matters for which risks and responsibilities were addressed." Lead op., ¶ 3.

¶ 88. The use of the *Huron* limitation creates an analytical disconnect in cases that involve a tort claim of fraud in the inducement. The disconnect is created because the type of case that the tort of fraud in the inducement is designed to address is the same type of case that the *Huron* limitation prevents from being brought. The court in *Budgetel* highlighted this problem:

> The tort, after all, is inducing someone to enter into a contract, so to say it does not apply where the tort involves the contract or its subject matter analytically makes no sense.

*Budgetel Inns,* 8 F. Supp. 2d at 1147.

¶ 89. Not only does the *Huron* limitation render a nullity the tort of fraud in the inducement, but it also undermines the very doctrine it purports to support. The lead opinion endorses the *Huron* limitation in furtherance of the economic loss doctrine. However, the purposes for the economic loss doctrine are undermined

by the *Huron* limitation. As the lead opinion notes, the economic loss doctrine was created to (1) maintain the fundamental distinction between tort law and contract law; (2) protect commercial parties' freedom to allocate economic risk by contract; and (3) encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against risk.

¶ 90. The first purpose of maintaining the distinction between tort law and contract law is compromised because the *Huron* limitation essentially eliminates the fraud in the inducement exception. Eliminating tort law in favor of contract law does not maintain a distinction. It instead does away with the distinction. In addition, the *Douglas-Hanson* rule, which does not have the *Huron* limitation, constitutes "a better, bright-line rule" in that "it does not require courts to ask the murky 'interwoven' question." *Budgetel Inns,* 8 F. Supp.2d at 1149.

¶ 91. With respect to the two other purposes for the economic loss doctrine, it is difficult for a party engaged in contract negotiations to freely assess, allocate and insure against risk when the other party is blatantly lying regarding material terms of the contract. *See Douglas-Hanson Co.,* 229 Wis. 2d at 145–47. The existence of tort remedies provides a deterrent effect against such conduct. Accordingly, it is hard to see how a party's ability to freely assess, allocate and insure against risk is advanced by removing the deterrent effect created by the tort remedies.

¶ 92. Let's be clear, we are talking here about *fraudulent* misrepresentation during the negotiations of a contract. The parties should be able to operate under a legal backdrop that promotes honest negotiation. While rescission and restitution may be adequate

remedies in many fraudulent inducement cases, there are certainly cases in which the fraud is so blatant and extensive as to warrant tort damages. Today, the lead opinion takes away the possibility of tort damages in those cases.

¶ 93. I also disagree with the lead opinion's effort to expand the rule set forth in *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 573 N.W.2d 842 (1998), without sufficient analysis. *Daanen & Janssen* held that privity is not required for the economic loss doctrine to bar a remote commercial purchaser from recovering economic losses from a manufacturer under theories of strict liability and negligence. *Id.*, 216 Wis. 2d 395, ¶ 1 and ¶ 38. The lead opinion prefers a significant expansion of this rule to cover situations such as this case in which the plaintiff is not a remote commercial purchaser, the defendant is not a manufacturer, and the tort claim is not strict liability or negligence.

¶ 94. Rather than explain its analysis, the lead opinion simply states that the language in *Daanen & Janssen* is clear in establishing a rule that the "economic loss doctrine precludes recovery in tort for solely economic losses, regardless of whether privity of contract exists between the parties." Lead op., ¶ 4, ¶ 22 and ¶ 69. However, the lead opinion's formulation is clearly an expansion of the holding of *Daanen & Janssen* and the lead opinion should more fully explain its reasoning for making such an expansion.

¶ 95. Since Bacher had no contract with Ameritech, presumably the lead opinion's application of *Daanen & Janssen* leaves Bacher without a tort remedy or a contract remedy. It acknowledges that Bacher raised the concern that if the economic loss doctrine prevents its intentional tort claim, it will be left without

a remedy for Ameritech's fraud. Lead op., ¶ 31. However, the opinion does not explain why Bacher being left without a remedy is the correct result. Perhaps it did not address this question because it cannot fairly answer it.

¶ 96. Finally, I take issue with the lead opinion's third conclusion in this case: "We also hold that recovery of the benefit of the bargain is not permissible where the fraud in the inducement exception applies and tort remedies are sought." Lead op., ¶ 4; *see also* ¶ 23, ¶ 67, ¶ 70. Because the lead opinion determined in ¶ 62, ¶ 65 and ¶ 68 that Digicorp's and Bacher's fraud in the inducement claims are not permitted to proceed, I am at a loss as to why the opinion makes a conclusion that is only relevant if one of those claims was permitted to proceed.

¶ 97. In sum, I disagree with the lead opinion's endorsement of the *Huron* limitation to the fraud in the inducement exception to the economic loss doctrine. Further, I take issue with its unexplained effort to expand the *Daanen & Janssen* rule regarding contractual privity and its reaching out and taking a position on an issue regarding the benefit of the bargain that it need not address. Accordingly, I respectfully dissent.

¶ 98. I am authorized to state that WILLIAM A. BABLITCH, J., joins this dissent.